**In re James D. HUTCHINSON, Respondent.**

**No. 85–53.**

District of Columbia Court of Appeals.

Argued Oct. 22, 1985.

Decided Dec. 8, 1986.

John M. Bray, with whom Judah Best and Charles J. Landy, Washington, D.C., were on the brief, for respondent.

Michael S. Frisch, Asst. Bar Counsel, with whom Thomas H. Henderson, Jr., Bar Counsel, Washington, D.C., was on the brief, for petitioner, the Office of Bar Counsel.

Joan L. Goldfrank, Executive Atty., Washington, D.C., for the Bd. on Professional Responsibility.

Before PRYOR, Chief Judge, and TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

In this disciplinary case, the Board on Professional Responsibility ("the Board") found that respondent Hutchinson's untruthful testimony before the Securities and Exchange Commission (SEC) in February 1982 was conduct involving moral turpitude that adversely reflected on his fit-

ness to practice law, in violation of Disciplinary Rule (DR) 1–102(A)(3); conduct involving dishonesty and misrepresentation, in violation of DR 1–102(A)(4); and conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5).[1] The Board also found that Hutchinson's disclosure of certain material non-public information relating to a tender offer, which resulted in a misdemeanor conviction under 15 U.S.C. § 78ff(a) (1982) and 17 C.F.R. § 240.14e–3(d) (1983), amounted to "statutory fraud" and was therefore a separate violation of DR 1–102(A)(4). The Board recommended that Hutchinson be suspended from the practice of law for one year.

Hutchinson argues that the Board erred in concluding that the conduct which served as the basis for his misdemeanor conviction amounted to "statutory fraud." He also contends that the Board's recommended sanction of a one-year suspension is too severe because there are mitigating factors established by the record, and because a suspension that long would foster a tendency toward inconsistent dispositions for comparable conduct.[2] We hold that Hutchinson's disclosure of inside information did not constitute "statutory fraud," notwithstanding his misdemeanor conviction, and that he therefore did not violate DR 1–102(A)(4) by making that disclosure. We also hold, principally on the authority of *In re Reback,* 513 A.2d 226 (D.C.1986) (en banc), that the appropriate sanction in this case is a suspension for six months.[3]

## I

Hutchinson was a partner in a large Washington law firm. Within that firm his specialty was pension law. Hutchinson's practice did not involve securities law, but he did trade extensively in securities for his own account.

On January 21, 1982, Hutchinson received a telephone call from a close friend, a California attorney named William Chadwick, who told Hutchinson that he believed a tender offer was about to be made for the Brunswick Corporation. Chadwick said that he had invested in Brunswick, recommended that Hutchinson invest in it also, and offered to split any profits or losses if Hutchinson decided to buy Brunswick stock. When Hutchinson pressed for details, Chadwick said that he believed he did not have inside information and that his broker had confirmed this. Chadwick told Hutchinson that his conclusions about Brunswick were based on cocktail-party conversations and on independent analysis by him and a friend, whose identity he did not then disclose.

Within five minutes after talking with Chadwick, Hutchinson purchased forty Brunswick call options. The next day he bought one hundred more options through the same broker and attempted (unsuccessfully) to buy yet another fifty through a second broker in Florida. He also decided to pass along the recommendation to invest in Brunswick to another friend, Robert Chaloupka. Hutchinson first tried to call Chaloupka on Friday, January 22, but he was unable to reach him until Monday morning, January 25. By then trading in Brunswick stock had been suspended, although Hutchinson did not know this at the time. Chaloupka never bought any Brunswick stock or options.

On Monday, January 25, the Whittaker Corporation publicly announced its take-

---

1. DR 1–102(A) provides in part:
   A lawyer shall not:
       *    *    *    *    *    *
       (3) Engage in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law.
       (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
       (5) Engage in conduct that is prejudicial to the administration of justice.

2. Hutchinson does not challenge the Board's finding that his untruthful testimony before the SEC violated three Disciplinary Rules.

3. With notice to the parties, we held this case in abeyance pending our en banc decision in *Reback.* After *Reback* was decided, the parties all filed supplemental briefs discussing its applicability to Hutchinson's case.

over of Brunswick, and trading in Brunswick stock was temporarily suspended. On the same day, an SEC attorney called Hutchinson's office to ask whether his law firm represented either Brunswick or Whittaker. Hutchinson was out of the office, but through his secretary he sent word to the SEC attorney that his firm represented neither company. On January 26 Hutchinson himself called the SEC attorney and verified this. During that call he was asked to participate in an informal SEC inquiry and to answer questions about his personal trading in Brunswick options, and he agreed to do so.

The next day, January 27, Hutchinson called Chadwick to tell him that he had agreed to testify before the SEC about his Brunswick trading. Chadwick then told Hutchinson, for the first time, that his information about Brunswick had come not from his own analysis or that of his broker but from Martin Cooper, an officer of a Los Angeles bank in charge of the Whittaker account (the unidentified "friend" mentioned in the first telephone call). Chadwick said that both he and Cooper would be "sunk" if Hutchinson revealed their January 21 conversation to the SEC because the information from Cooper would undoubtedly be regarded as inside information, and trading on it would constitute insider trading, which is illegal. After some discussion, Hutchinson agreed to lie to the SEC about the nature and source of his information about Brunswick if he was asked about it.

Hutchinson was deposed under oath by the SEC staff on February 2, February 16, March 29, April 1, and April 30, 1982. At the first two meetings, at which he was not represented by counsel, Hutchinson denied that he had discussed his purchase of Brunswick options with Chadwick or with anyone other than his own broker and denied that he had recommended the purchase of Brunswick stock to anyone else. He also said that he had first learned of the tender offer for Brunswick from his broker on January 25, the date of the public announcement by Whittaker of the takeover bid. He denied having had any information before January 25 that a tender offer might be made for Brunswick. He told the SEC investigators that his sudden interest in Brunswick had resulted from his own research in the financial press and his personal strategy of purchasing low-priced options on stock which had recently traded at or below the option price.

Sometime between February 2 and February 16, Hutchinson unsuccessfully tried to convince Chadwick to agree to let him tell the truth to the SEC. Finally, on March 12, Hutchinson met with Chadwick and Chadwick's attorneys, and all of them agreed that Hutchinson and Chadwick would both contact the SEC and tell the whole truth. After that meeting, Hutchinson for the first time retained his own counsel, who contacted the SEC and made arrangements for Hutchinson to correct and supplement his earlier statements.

At the depositions in March and April, Hutchinson recanted his prior testimony and testified truthfully about his conversations with Chadwick, his agreement with Chadwick to lie to the SEC, and his efforts to relay the advice about Brunswick to Robert Chaloupka. In addition, on April 29, 1982, he voluntarily deposited all the profits he had made from trading in Brunswick options into an escrow account.

The SEC then brought a civil enforcement action against Hutchinson, Chadwick, and Cooper in the United States District Court for the Central District of California. In that proceeding, without admitting or denying the allegations in the SEC's complaint, Hutchinson agreed in a consent order to surrender the profits he had made (approximately $72,000) from his trading in Brunswick securities. This money was eventually distributed to other sellers of Brunswick options. The consent order, which was entered on July 15, 1982, also provided for certain injunctive relief against Hutchinson.

About a year later,[4] in the United States District Court for the District of Columbia, Hutchinson was convicted of a criminal violation of the federal securities laws. An information filed by the United States Attorney charged him with a misdemeanor under 15 U.S.C. § 78ff(a) (1982), the penalty section of the Securities Exchange Act of 1934 ("the 1934 Act"), and 17 C.F.R. § 240.14e–3(d) (1983), which, broadly speaking, prohibits the communication of inside information about tender offers. On July 28, 1983, Hutchinson pleaded guilty and was fined $10,000.

The subsection of the regulation which Hutchinson was charged with violating, subsection (d), does not prohibit the purchase or sale of securities. Rather, it makes unlawful the communication of "material non-public information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable" that the other person will purchase or sell securities in the company which is the subject of the tender offer. Thus the criminal case against Hutchinson was based not on his personal trading in Brunswick options (as was the civil action in the Central District of California) but on his communication to Chaloupka of the impending tender offer for Brunswick. Furthermore, Hutchinson was convicted and sentenced under that portion of 15 U.S.C. § 78ff(a) which permits only a fine as punishment when the defendant proves that he had no knowledge of the regulation he was violating.[5]

## II

On November 28, 1983, Bar Counsel filed a petition instituting formal disciplinary proceedings against Hutchinson. Some time before that, when a copy of the misdemeanor conviction was filed with this court, we ordered the immediate suspension of Hutchinson from the practice of law, concluding that he had been convicted of a "serious crime" within the meaning of Rule XI, section 15 of our Rules Governing the Bar.[6] Hutchinson moved for reconsideration, and after full briefing and oral argument, we granted the motion and ruled that the misdemeanor at issue was not *per se* a serious crime, so that immediate suspension of Hutchinson was not required under the rule. *In re Hutchinson*, 474 A.2d 842 (D.C.1984) (*Hutchinson I*). We remanded the case to the Board for further proceedings under D.C.Bar R. XI, § 15(5).

After an evidentary hearing, a hearing committee of the Board concluded (1) that Hutchinson's trading in Brunswick securities did not violate any Disciplinary Rule; (2) that neither Hutchinson's communication to Chaloupka nor the misdemeanor conviction based on that communication constituted a violation of any Disciplinary Rule; and (3) that Hutchinson's false statements to the SEC lawyers constituted (a) conduct involving moral turpitude that adversely reflected on his fitness to practice

---

**4.** Hutchinson resigned from his law firm as of December 31, 1982.

**5.** 15 U.S.C. § 78ff(a) imposes criminal penalties for any willful violation of the 1934 Act (with an exception not pertinent here) "or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of [the 1934 Act] ... but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation."

**6.** D.C.Bar R. XI, § 15 provides in pertinent part:
(1) Upon the filing with the Court of a certified copy of the court record ... demonstrating that an attorney has been found guilty of a serious crime as hereinafter de-

fined, the Court shall enter an order immediately suspending the attorney.... Upon good cause shown, the Court may set aside such order of suspension when it appears in the interest of justice so to do.
(2) The term "serious crime" shall include any felony and any lesser crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."

law, in violation of DR 1–102(A)(3),[7] (b) conduct involving dishonesty and misrepresentation, in violation of DR 1–102(A)(4), and (c) conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5). The hearing committee recommended that Hutchinson be suspended from the practice of law for one year.

The Board adopted all of the hearing committee's conclusions as its own, with one exception. Contrary to the hearing committee, the Board ruled that Hutchinson had been convicted of what it called "statutory fraud," and that the conduct underlying the conviction amounted to a separate, additional violation of DR 1–102(A)(4). The Board also recommended a one-year suspension.

### III

■ Hutchinson asserts that the Board erred in its conclusion that DR 1–102(A)(4), which prohibits an attorney from engaging in conduct involving fraud, was violated by the conduct which led to his misdemeanor conviction. We agree.

In its report the Board stated:

Whether Hutchinson knew it or not, his conversation with Chaloupka was *statutory fraud.* That is, federal law makes it fraud, even though Hutchinson may have actually and honestly believed he was acting lawfully. Since DR 1–102(A)(4) prohibits an attorney from engaging in conduct involving fraud, and since Hutchinson's communication with Chaloupka and his conviction *definitionally* involved fraud, we find a violation. [Emphasis added.]

Thus the Board held that Hutchinson's conduct violated DR 1–102(A)(4) because the crime of which he was convicted necessarily involved fraud. That ruling was flatly contrary to our decision in *Hutchinson I, supra.* In that case we refused to characterize the crime of which Hutchinson was convicted as a "serious crime"[8] precisely because it did *not* necessarily involve fraud or deceit. We held:

Crucially, no intent of any kind is required in order to be convicted; a negligent communication is sufficient. Therefore, since the components of the definition of a serious crime relevant to this case are all intentional acts, such as fraud and deceit, and intent is not a necessary element of the crime of which respondent was convicted, respondent's offense cannot be deemed a serious crime under Rule XI, § 15(2).

474 A.2d at 845. The Board's conclusion that the conviction "definitionally" involved fraud is in direct conflict with *Hutchinson I.*

Bar Counsel argues that the Board's conclusion on this issue should be upheld because one of the elements of the offense to which Hutchinson pleaded guilty is the reasonable foreseeability "that the communication is likely to result in a fraudulent, deceptive, or manipulative act or practice in violation of the regulation." *Hutchinson I, supra,* 474 A.2d at 844–845. This argument ignores the very next sentence in our prior opinion, which said that "no intent of any kind is required in order to be convicted; a negligent communication is sufficient." *Id.* at 845. Furthermore, to violate DR 1–102(A)(4), the respondent himself, not someone else, must "[e]ngage in conduct involving ... fraud." The reasonably foreseeable consequence of the communication was not some further action by Hutchinson himself; rather, it was the anticipated conduct of the person to whom the disclosure was made—in this instance, Mr. Chaloupka.

■ Although he may have been suspicious, Hutchinson did not have actual knowledge that Chadwick's investment tip had an illegitimate source when he called

---

7. Because the finding of moral turpitude was unrelated to Hutchinson's criminal conviction, this case does not present the issue of whether he is subject to disbarment under D.C. Code § 11–2503 (1981). *See generally In re Colson,* 412 A.2d 1160 (D.C.1979) (en banc); *In re Kerr,* 424 A.2d 94 (D.C. 1980) (en banc).

8. See note 6, *supra.*

Chaloupka and recommended that he invest in Brunswick. In fact, Hutchinson specifically asked Chadwick whether his advice was based on inside information, and Chadwick assured him that it was not. He did not learn otherwise until two days after his conversation with Chaloupka. The record also shows—indeed, there is no dispute—that Hutchinson had no knowledge of the regulation and therefore no knowledge that his communication with Chaloupka was unlawful. Without actual knowledge that the information he possessed was inside information, we conclude that Hutchinson's conduct in advising Chaloupka to purchase some of the Brunswick stock did not necessarily involve dishonesty, fraud, deceit, or misrepresentation. We therefore cannot accept the Board's conclusion that "[w]hether Hutchinson knew it or not, his conversation with Chaloupka was statutory fraud ... even though Hutchinson may have actually and honestly believed he was acting lawfully." On this point the hearing committee was correct. In the absence of affirmative proof of a fraudulent intent or state of mind, we hold that Hutchinson's misdemeanor conviction did not establish a violation of DR 1–102(A)(4).

## IV

■ Hutchinson strongly contests the one-year suspension proposed by the Board. He maintains that the Board did not sufficiently take into account the mitigating factors present in this case and that the Board's recommended sanction would foster a tendency toward inconsistent dispositions for comparable conduct. He urges us to impose only a thirty-day suspension, if we decide that any suspension is warranted at all. We conclude that the appropriate sanction is a suspension for six months.

D.C.Bar R. XI, § 7(3), requires this court to "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." Although the rule makes clear that the choice of a sanction rests with the court, not the Board, it also directs us to give considerable deference to the Board's recommendation.

> [T]he rule endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise. The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable.

*In re Haupt,* 422 A.2d 768, 771 (D.C.1980); *accord, In re Hines,* 482 A.2d 378, 386 (D.C.1984); *In re Smith,* 403 A.2d 296, 303 (D.C.1979).

"In order to determine what discipline is appropriate under the circumstances, we must assess [Hutchinson's] violations in the light of all relevant factors." *In re Reback, supra,* 513 A.2d at 231. Those factors include "the nature of the violation, the mitigating and aggravating circumstances, [and] the need to protect the public, the courts, and the legal profession," *In re Haupt, supra,* 422 A.2d at 771, as well as "the moral fitness of the attorney," to the extent that we can discern it. *In re Smith, supra,* 403 A.2d at 303. Ultimately, however, "[w]ithin the limits of the mandate to achieve consistency, each case must be decided on its particular facts." *In re Haupt, supra,* 422 A.2d at 771; *accord, In re Hines, supra,* 482 A.2d at 386; *In re Smith, supra,* 403 A.2d at 303. "In all cases, our purpose in imposing discipline is to serve the public and professional interests we have identified, rather than to visit punishment upon an attorney." *In re Reback, supra,* 513 A.2d at 231 (citations omitted).

Looking to the pertinent factors in this case, we find the nature of the violation quite serious. Lying to an agency of the federal government is a felony under the laws of the United States, punishable by imprisonment for five years or a fine of

$10,000, or both. 18 U.S.C. § 1001 (1982). Lying under oath, of course, is perjury. 18 U.S.C. § 1621 (1982). It is also, obviously, a dishonest act. Lawyers have a greater duty than ordinary citizens to be scrupulously honest at all times, for "[h]onesty is basic to the practice of the law." *In re Reback, supra,* 513 A.2d at 231 (citation omitted). The need to protect the legal profession is also significant here. Every lawyer has a duty to foster respect for the law, and any act by a lawyer which shows disrespect for the law tarnishes the entire profession. The need to protect the public and the courts is somewhat less important in this case, given the isolated nature of the incident and the fact that it was unrelated to any court proceeding. Hutchinson's moral fitness to continue to practice law does not greatly trouble us, for the record reveals not only that he is genuinely contrite but also that he has taken steps toward an understanding of the root causes of his behavior. Additionally, we see no aggravating factors in this case that would suggest a sanction greater than that which the violations themselves call for.

There are significant factors in mitigation, as the Board itself recognized. To begin with, Hutchinson has no prior disciplinary record. Since being admitted to the bar in 1968, he has had a distinguished career encompassing both government service and private practice. Just as a prior disciplinary record is a factor which may be considered in aggravation, *see In re Roundtree,* 467 A.2d 143, 147–148 (D.C. 1983), so may the absence of such a record be considered in mitigation. *See In re Reback, supra,* 513 A.2d at 233. The Board also observed that Hutchinson recanted his false testimony on his own volition and that he voluntarily surrendered all profits from his illegal trading in Brunswick options. Finally, Hutchinson's disciplinary violations

9. Given the Board's acknowledgment of these factors, we find this case clearly distinguishable from *In re Cope,* 455 A.2d 1357 (D.C.1983).

10. Bar Counsel urged before the Board, and continues to urge before this court, that Hutchinson should be suspended for three years.

occurred at a time of marital crisis when he was emotionally dependent on his close friend Chadwick (who, the Board noted, was the author of the cover-up). In the ensuing months he not only was remorseful but sought psychiatric counseling.[9]

"Accepting the facts in mitigation as true," the Board nonetheless recommended a suspension for one year.[10] Its reasoning was as follows:

> Hutchinson engaged in reprehensible conduct. He lied to an official investigative body in order to shield himself and others from possible civil and criminal liability. And he lied not once but twice, with sufficient time between the incidents to allow him to reflect on the gravity of his actions. Every citizen must know that this is unacceptable behavior in a society that places a great premium —indeed, is founded—on voluntary compliance with the law. For a lawyer, whose training and practice should make him especially sensitive to the obligation of truthfulness in official investigations, to lie to an investigative body is inexcusable. Had Hutchinson been convicted of perjury or of false statements to a federal official, a conviction which these facts would likely support, he would surely be disbarred.

We share the Board's outrage and agree with its sentiments. Nevertheless, recognizing our duty to avoid "inconsistent dispositions for comparable conduct," D.C. Bar R. XI, § 7(3), we hold that the suspension imposed on Hutchinson should be no greater than that imposed on the two respondents in *In re Reback, supra.* [11]

In both this case and *Reback,* the respondents were found to have violated DRs 1–102(A)(4) and (5) (conduct involving dishonesty, fraud, deceit, or misrepresenta-

11. We note that the Board made its recommendation more than a year before *Reback* was decided.

tion, and conduct prejudicial to the administration of justice). While both attorneys in *Reback* also violated DRs 6–101(A)(3) (neglect of a legal matter) and 7–102(A)(5) (knowingly making a false statement of law or fact), Hutchinson also violated DR 1–102(A)(3) (conduct involving moral turpitude which adversely reflected on his fitness to practice law). In both cases no aggravating factors were present, but there were three important mitigating factors: the respondents admitted their wrongdoing, cooperated fully in the disciplinary proceedings, and had previously unblemished records of professional conduct during their years at the bar. Although comparisons are inexact at best, and "every case must turn on its own particular facts," *In re Hines, supra,* 482 A.2d at 386, there are enough similarities between this case and *Reback* to persuade us that similar sanctions are warranted.

To support his argument for a thirty-day suspension, Hutchinson primarily relies on *In re Rosen,* 481 A.2d 451 (D.C.1984); *In re Kent,* 467 A.2d 982 (D.C.1983); *In re Keiler,* 380 A.2d 119 (D.C.1977); and *District of Columbia Bar v. Kleindienst,* 345 A.2d 146 (D.C.1975). Each of these cases is distinguishable from the case at bar.

In *Rosen* we held that a thirty-day suspension was appropriate for an attorney who made three separate misrepresentations to a federal court, even though he had a record of prior disciplinary violations. The attorney's conduct in *Rosen* resulted from procrastination and lack of preparation, whereas Hutchinson's conduct was knowing and willful. Moreover, Rosen was found to have violated only two disciplinary rules, whereas Hutchinson violated three. Since Hutchinson's conduct was more serious than Rosen's, we believe his sanctions should be more severe.

In *Kent* the attorney openly shoplifted merchandise from a department store, apparently trying to be caught. She was suspended for thirty days, primarily because her act was impulsive and isolated, because it was unrelated to the practice of

law, and because she voluntarily sought psychiatric help for her misconduct. Hutchinson's conduct in twice giving testimony which he knew to be false cannot be equated with Kent's "neurotic desire to be caught." 467 A.2d at 984. Furthermore, Kent had already undergone what amounted to a self-imposed suspension of more than two years. *See id.* at 985. Thus a stronger sanction is warranted in Hutchinson's case than in *Kent.*

In *Keiler* the attorney selected a partner in his own law firm to serve as an arbitrator in a labor dispute in which he represented one of the parties. The supposedly impartial arbitrator ruled in favor of Keiler's client without revealing his relationship with Keiler or his law firm. This court imposed a thirty-day suspension, even though we concluded that the attorney's conduct had perpetrated a fraud on the judicial system and compromised the administration of justice. Keiler was found to have violated only one disciplinary rule, however, while Hutchinson violated three.

The respondent in *Kleindienst,* in hearings before a Senate committee on his nomination to be Attorney General of the United States, lied to the committee about his involvement in certain antitrust litigation. This court rejected the one-year suspension recommended by the Board, imposing instead a thirty-day suspension. Although *Kleindienst* is somewhat analogous to the case at bar, it is also distinguishable. Kleindienst's disciplinary violation had already been the subject of proceedings in his home state of Arizona which had resulted only in a censure. The same act of misconduct had been the subject of a criminal prosecution in which Kleindienst had received a suspended sentence. In addition, a three-judge committee of the United States District Court for the District of Columbia had considered the same conduct by Kleindienst and concluded that no disciplinary action was warranted. None of these factors are present in the instant case. Moreover, to the extent that *Kleindienst* may be inconsistent with *In re Re-*

*back, supra,* we are bound to follow *Reback* rather than *Kleindienst* because *Reback* is a decision of the court en banc. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

The Board argues that the controlling case here is *In re Wild,* 361 A.2d 182 (D.C.1976). Wild, a vice president of Gulf Oil Corporation, was involved in making secret, illegal campaign contributions totaling $100,000 out of corporate funds to the Committee to Re-Elect the President.[12] Although he acted out of fear of what would happen if he did not contribute the money after being importuned by two cabinet officers, he also tried to prevent public disclosure of his illegal conduct. Eventually, however, he came forward voluntarily and cooperated completely with investigating authorities. This court suspended him for one year from the practice of law.

We think that *Wild* is distinguishable from the instant case. Wild not only tried to prevent disclosure of his own illegal act, but in his capacity as an officer of the corporation he engaged in deceptive conduct in violation of his fiduciary duty to his company's shareholders. He also violated federal election laws which were enacted to protect the public interest by preventing corruption of the political process. Hutchinson's conduct is simply not comparable to what Wild did.

Bar counsel cites *State ex rel. Nebraska State Bar Association v. Cook,* 194 Neb. 364, 232 N.W.2d 120 (1975), as authority supporting his recommendation of a three-year suspension. Cook, while chairman of the SEC, gave false testimony to a grand jury about certain contributions to the Committee to Re-Elect the President by a man named Robert Vesco, who was the subject of an SEC investigation. Cook was suspended for three years by the Supreme Court of Nebraska. In its brief the Board responds to Bar Counsel's reliance on *Cook:*

[T]here is no evidence that [Cook's] three-year suspension represents a nationwide standard that would compel this court to override the Board's recommendation.

\* \* \* \* \* \*

[Cook's] conduct was a direct interference with the political process and a betrayal of his public duty, whereas Hutchinson's actions were personal and totally unrelated to his job or the practice of law.

More importantly, *Cook* is of no precedential value to this court. It is a case from another jurisdiction and inconsistent with this court's dispositions.... Adoption of its precedent would actively foster a tendency towards inconsistent dispositions.

We agree with the Board and decline to follow *Cook.*

### V

It is therefore ORDERED that respondent, James D. Hutchinson, is suspended from the practice of law in the District of Columbia for a period of six months, effective thirty days from the date of this opinion.

STEADMAN, Associate Judge, concurring in part and dissenting in part:

I analyze the sanction question somewhat differently from the majority. I believe insufficient attention is given to the factor of potential consequences of the untruthful testimony. In *In re Reback,* 513 A.2d 226 (D.C.1986) (en banc), which the majority finds comparable to this case, we were careful to point out, in discussing the seriousness of the respondents' untruthful conduct:

Indeed, no substantive harm presumably would have ensued even if the falsity of the signature on the new complaint had never come to light, since the facts

---

12. The Committee to Re-Elect the President was the principal campaign organization seeking the re-election of President Nixon in 1972.

stated therein were identical to those contained in the original complaint signed by the client. Of course, if respondents' dishonesty had led to adverse consequences, *even if temporary,* or *would have done so if undiscovered,* that would put them at far greater risk of severe discipline. *Id.* at 232 n. 5 (emphasis added).

Here, respondent lied to an official investigative body in order to shield himself and others from possible civil and criminal liability. His doing so, it is fair to assume, must have had at least temporary consequences in hindering the investigation and, if undiscovered, might have thwarted it altogether. I thus agree with the reasoning of the Board, quoted in the majority opinion,[1] underlying its recommendation for a one-year suspension, and I believe such a sanction not only could survive but would be consistent with our en banc holding in *Reback.*

What I am uncertain of is the degree to which the recommendation for a one-year suspension reflected the Board's erroneous belief that respondent had also committed "statutory fraud." Since I think that this court should be strongly inclined to "respect the Board's sense of equity in these matters [of sanction] unless the exercise of judgment proves to be unreasonable," *In re Haupt,* 422 A.2d 768, 771 (D.C.1980), I would remand to the Board for a new recommendation as to the appropriate sanction.

---

1. The Board also observed, in another part of the report: "Hutchinson's false statements were for one purpose only—to conceal unlawful activity engaged in by his friend, his friend's source, and himself.... However Hutchinson rationalized his conduct, the fact remains that its purpose was to impede an investigation into unlawful activity."