In re Nathaniel SIMS, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals.

No. 98–BG–1384.

District of Columbia Court of Appeals.

Argued April 16, 2003.

Decided March 11, 2004.

---

Samuel McClendon for respondent.

Elizabeth A. Herman, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before TERRY and REID, Associate Judges, and KING, Senior Judge.

REID, Associate Judge:

The Board on Professional Responsibility ("the Board" or "BPR") recommends that Respondent Nathaniel Sims be disbarred based on a misdemeanor conflict of interest conviction which it concludes "involves moral turpitude on the facts," and because of violations of Rules 8.4(b), (c), and (d) of the District of Columbia Rules of Professional Conduct. Mr. Sims filed an "exception to the conclusions of law and recommended sanction" of the Board. We hold that in the case of a misdemeanor conflict of interest, a non-serious crime, the Board may determine whether or not that offense involves moral turpitude on the facts. We also set forth legal principles to guide the moral turpitude inquiry in this case. Since neither the Hearing Committee nor the Board has had an opportunity to make the moral turpitude inquiry under the legal princi-

ples set forth in this opinion, we remand this matter to the Board with instructions to remand it to the Hearing Committee for a determination as to whether or not Mr. Sims was convicted of an offense involving moral turpitude on the facts. Thereafter, the Board shall submit a revised report and recommendation to this court.

## FACTUAL SUMMARY

The record before us shows that beginning around February 1997, the FBI launched an investigation into allegations of impropriety by Mr. Sims. At the time, Mr. Sims was a hearing examiner in the Bureau of Traffic Adjudication ("BTA") at the District of Columbia Department of Public Works.[1] Two FBI agents interviewed then current and former staff at the BTA, the project manager for the computerized Ticket Information Management System ("TIMS") used to keep track of the issuance and disposition of traffic tickets, and Mr. Sims. An unsigned March 24, 1997 report of the two FBI Agents stated, in part:

The Acting Chief [of the BTA] with the assistance of the TIMS Project Manager for Ticket Processing, Lockheed Martin, the contractor who maintains the TIMS data base for the District,

provided hard copies of a total of $1,280.00 in reductions and suspensions made between March 6, 1996 and February 4, 1997, for [Mr. Sims] and his wife and daughter's tickets. (3) tickets were dismissed and 2 points were suspended for his wife ... and (1) ticket was dismissed for his daughter .... (18) tickets were dismissed for [Mr. Sims]. All the entries in TIMS on the (22) tickets reflected [Mr. Sims'] identification code and the [h]earing [o]fficer codes of either [Mr. Sims] or other [h]earing [o]fficers.

Later, on April 15, 1998, the United States Attorney for the District of Columbia sent Mr. Sims' attorney a proposed plea agreement. Paragraph (1) of that agreement specified that:

Mr. Sims agrees to plead guilty to a one-count Information charging violations of Title 18, United States Code, Sections 208 and 216(a)(1) (Conflict of Interest—misdemeanor). It is understood that the guilty plea will be based on a factual admission of guilt to the offense charged to be made before the [c]ourt by Mr. Sims and will be entered in accordance with Rule 11 of the Federal Rules of Criminal Procedure.

1. Mr. Sims received a B.S. in zoology from the University of Kansas in 1966, a doctorate in educational administration from the University of Massachusetts at Amherst in 1971, and a J.D. from the Georgetown University Law Center in 1974. From 1972 to 1976, he trained hearing examiners to adjudicate special education and disciplinary cases. He later served as chief hearing officer or examiner for the District of Columbia Department of Personnel, and the District of Columbia Rental Accommodations office. Subsequently, he became executive director of the District of Columbia Educational Institution Licensure Commission in 1979 and continued in that position until 1987. He also served in other positions, including that of utility program manager for the District of Columbia Depart-

ment of Public Works, and ultimately went to the District of Columbia Bureau of Traffic Adjudication as a part of a Reduction in Force ("RIF") process. He retired from the government in 1997, and entered the private practice of law. He also has worked part-time for a funeral home.

Mr. Sims, who has been married for approximately thirty-six years, has five children, including two who still are in elementary and secondary school, and also has raised four foster children whose care he assumed following the death of their mother. He has been active in a number of organizations, including the Boy Scouts where he serves as a cub master, the Hillcrest Children's Center, the parents-teachers associations of his children's schools, and his local church.

In Paragraph (7), "[t]he government reserve[d] the right to set forth at sentencing all of its evidence with respect to Mr. Sims' criminal activities . . . ." Mr. Sims and his counsel signed the plea agreement on April 20, 1998.

On that date, Mr. Sims entered a plea of guilty to a one count violation of 18 U.S.C. §§ 208 and 216(a)(1) before a United States Magistrate Judge in the United States District Court for the District of Columbia. The Information to which he pled guilty stated:

1. At all times material herein:

(a) the defendant [Mr. Sims] was employed as a[h]earing [e]xaminer by the [BTA];

(b) a [h]earing [e]xaminer's duties included adjudicating notices of infraction (tickets) which had been issued concerning motor vehicles;

(c) a [h]earing [e]xaminer is required to document the decision made during an in-person hearing by completing a[h]earing [r]ecord and by entering the disposition into the BTA Ticket Information Management System;

(d) a [h]earing [e]xaminer is precluded by BTA regulations from adjudicating tickets which had been issued to him and/or members of his family.

## CONFLICT OF INTEREST

2. On or about December 9, 1996, within the District of Columbia, the defendant [Mr. Sims], being an employee of the Government of the District of Columbia, participated personally and substantially as a government employee, through decision in a request for a ruling or other determination, in a matter in which he knew he had a financial interest; that is, the defendant [Mr. Sims] dismissed ticket number 202711902 which had been issued on De-

cember 9, 1996 by an employee of the Department of Public Works on the car leased by the defendant [Mr. Sims] thereby releasing the defendant [Mr. Sims] from his obligation to pay the $50 fine.

During the plea hearing, the prosecutor summarized the government's evidence related to the offense charged in the Information, and added that:

The evidence would further have shown that between October 26th of 1995 and February 4 of 1997, [Mr. Sims] adjudicated 19 other tickets which affected him or his family and resulted in a suspension of fines and late penalties totaling an additional $1,230.00(sic).

When the Magistrate Judge asked, "Mr. Sims, is that in fact what happened, sir, with regard to the matter alleged in the information," Mr. Sims replied: "Yes, Your Honor." Mr. Sims was sentenced on August 5, 1998, to eighteen months of probation, and ordered to pay a fine of $500.00 and a mandatory special assessment of $25.00. In addition, he was ordered to complete fifty hours of community service. Mr. Sims satisfied the order for restitution of $1,280.00 prior to his sentencing.

After receiving notice of Mr. Sims' conviction, Bar Counsel's office sent a letter to the Clerk of this court advising that: "In the absence of a willfulness element, we believe that the offense does not constitute a 'serious crime' as defined by D.C. Bar R. XI, § 10(b)." Tracking Bar Counsel's language, the Chief Judge of this court referred the matter to the BPR on September 23, 1998 for appropriate action, concluding in part that: "[I]t appear[s] that the [misdemeanor] offense [to which Mr. Sims entered a guilty plea] does not constitute a 'serious crime' as defined by D.C. Bar R. XI, § 10(b)." In response to this court's referral, Bar Counsel issued a specification of charges against Mr. Sims

on December 29, 1998. The specification set forth Mr. Sims' criminal conviction and his employment with the District government. In addition, Paragraphs (4), (5), and (7) of the specification alleged that:

> Between October 26, 1995 and February 5, 1997, [Mr. Sims] adjudicated 19 other tickets that affected his family or him and resulted in the forgiveness of fines and late penalties totaling an additional $1,230 (sic).

[Mr. Sims'] conduct violated the following provisions of the District of Columbia Rules of Professional Conduct:

> (a.) Rule 8.4(b), in that Respondent engaged in criminal conduct that reflected adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects;
>
> (b.) Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty, fraud, deceit and/or misrepresentation;
>
> (c.) Rule 8.4(d), in that Respondent engaged in conduct that seriously interfered with the administration of justice . . . .

Respondent's criminal conviction involved moral turpitude on the facts, requiring his disbarment pursuant to D.C.Code § 11–2503(a).

A hearing on the specification of charges took place on May 26, 1999, before Hearing Committee Number Four of the BPR. Bar Counsel presented no witnesses, but rested its case on exhibits accepted into evidence by the Chairman of Hearing Committee Four.[2] In addition to findings pertaining to Mr. Sims' plea and sentence in the United States District Court for the District of Columbia, the Hearing Committee's factual findings included the following:

> The [FBI] investigation revealed that on 20 occasions between October 5, 1995 and January 31, 1997, [Mr. Sims] dismissed citations issued to vehicles registered to him, his wife, and two of his daughters.
>
> [Mr. Sims] effected the dismissals by logging into the BTA computer system with his identification code and secret password. With respect to a majority of those tickets, he used a disposition code for the dismissed tickets that reflected that a hearing examiner other than himself adjudicated the tickets.
>
> As a result of these actions by [Mr. Sims], he and his family avoided paying fines and late penalties in the amount of $1,280.[3]

---

**2.** Bar Counsel exhibits admitted into evidence were Exhibits 2 (FBI interview of the Acting Chief of the BTA on 2/24/97), 3 (FBI interview of Mr. Sims on 2/13/97), 5 (FBI interview on 2/20/97 of the Project Manager for District of Columbia Municipal Services who had oversight of TIMS), 6 (FBI interview of a BTA hearing examiner on 4/2/97), 8 (FBI interview of a BTA hearing examiner on 4/2/97), 9 (FBI interview of a former BTA hearing examiner on 4/11/97), 10 (3/24/97 report of two FBI agents regarding the investigation of Mr. Sims), 11 (Matrix of dismissed citations issued to vehicles registered to the family of Mr. Sims), 12 (U.S. Criminal Case Docket for Mr. Sims' case), 13 (4/15/98–4/20/98 plea agreement between the government and Mr. Sims), 14 (Information filed against Mr. Sims

on April 16, 1998), 15 (4/20/98 transcript of Mr. Sims' plea hearing), 16 (8/5/98 transcript of Mr. Sims' sentencing hearing), 17 (8/14/98 judgment entered in Mr. Sims' case), and 18 (order of this court referring Mr. Sims' case to the BPR). The FBI documents and the matrix in the record are neither signed nor sworn.

**3.** The sum of $1,230.00, mentioned during Mr. Sims' plea hearing appears to be an error. The transcript of Mr. Sims' sentencing hearing references a cost to the District government of $1,280.00, but also states that the restitution amount paid by Mr. Sims was $1,260.00, although the probation conditions include the sum of $1,280.00.

At the hearing [before Hearing Committee Four], [Mr. Sims] testified that he dismissed the tickets issued to vehicles owned or leased by him and his family using only the personal disposition codes assigned to him. However, the evidence in the record shows that [Mr. Sims] also used the personal disposition codes of other hearing examiners to dismiss tickets or to remove late penalties or points on his own tickets or on tickets issued to his wife or his daughter. For example, Bar Exhibit 11 is a list of the 20 dismissed citations issued to vehicles registered to the family of [Mr.] Sims. Of the 20 citations listed, 17 were dismissed using the Hearing Examiner ID Code of a Hearing Examiner other than [Mr. Sims]. [Mr. Sims] has conceded that he dismissed the citations. Evidence in the record demonstrates that all Hearing Examiners had access to the Hearing Examiner ID codes for all of the other Hearing Examiners. Based on the evidence in the record, we find that [Mr. Sims] did make dispositions of tickets issued to him and to members of his family, using the personal disposition codes of other hearing examiners.

The Hearing Committee concluded that Mr. Sims violated Rules 8.4(b), (c) and (d). It determined, however, that given this court's conclusion in its referral to the Board, that Mr. Sims' crime was not a "serious crime" within the meaning of D.C. Bar R. XI, § 10(b), he did not commit a crime of moral turpitude requiring disbarment under D.C.Code § 11–2503(a) (1999). Based on past cases, the Hearing Committee considered an appropriate sanction for Mr. Sims' behavior to be a suspension of one year, with a fitness requirement for reinstatement. As the Hearing Committee stated:

[Mr. Sims'] acts in this case ... were not the result of inexperience or a prov-en psychological condition. [He] was an experienced hearing examiner who violated the public trust by engaging in numerous misrepresentations to avoid paying $1,280 in fines and rectify a perceived but never proven inequity in the workplace ....

The BPR disagreed with the Hearing Committee regarding its disposition under D.C.Code § 11–2503(a), and the implications of this court's conclusion that Mr. Sims did not commit a "serious crime." Ultimately, the BPR stated: "The crime of conflict of interest under 18 U.S.C. § 208 is a misdemeanor. Thus, the question whether the conduct underlying the conviction involves moral turpitude leading to disbarment pursuant to D.C.Code § 11–2503(a) must be considered on the facts." After citing case law, particularly *In re Tucker*, 766 A.2d 510 (D.C.2000), the BPR concluded:

[Mr. Sims'] repeated abuse of the trust placed upon him as a government employee in order to benefit himself financially satisfies the ... criteria for moral turpitude. [His] conduct is at least as reprehensible as that found in *Tucker*. [Mr. Sims] dismissed a large number of tickets in which he or his family had a personal financial interest. [He] not only acted for his own enrichment, but he did so in his official capacity. The reported amount of the tickets "fixed" in *Tucker* was less than in the present case. As in *Tucker*, [Mr. Sims'] conduct took place over an extended period of time and [he] testified that he was familiar with the BTA policy precluding adjudication of matters that affect BTA employees or their families.

Furthermore, the Hearing Committee determined that [Mr. Sims'] acts in this case were not the result of inexperience or a proven psychological condition .... In this case, [he] was an experienced

hearing examiner who violated the public trust by engaging in numerous misrepresentations to avoid paying $1,280 in fines and rectify a perceived but never proven inequity in the workplace.

Consequently, the BPR "conclude[d] that, under all the facts and circumstances, [Mr. Sims'] misdemeanor conviction involves moral turpitude on the facts. The underlying conduct also violates Rules 8.4(b), (c) and (d)." The Board recommended disbarment.

Following oral argument in this matter, the court requested supplemental briefing on the following issue:

> In determining whether respondent was convicted of a crime of moral turpitude, within the meaning of D.C. Code § 11–2503(a) (2001), may the Hearing Committee and the Board consider underlying facts related to similar uncharged crimes, or must the Hearing Committee and the Board look only to the facts underlying the specific criminal misdemeanor charge to which respondent entered a guilty plea?

Bar Counsel answered the question in the affirmative, and Mr. Sims in the negative.

## ANALYSIS

Bar Counsel, supporting the report and recommendation of the Board, contends that Mr. Sims was convicted of a crime of moral turpitude on the facts, in addition to violating Rules 8.4(b), (c) and (d), and that the appropriate sanction is disbarment. Mr. Sims, taking exception to the report and recommendation of the Board, contends that a non-serious misdemeanor may never serve as a basis for a moral turpitude finding as the hearing committee held, or in the alternative, his conviction of a "single count of conflict of interest" does not constitute a crime of moral turpitude under the circumstances of his case, and "that the appropriate sanction in this case is a short suspension without a fitness requirement."

### Standard of Review

■ Generally, under D.C. Bar R. XI, § 9(g)(1), this "[c]ourt shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI § 9(g)(1) (2002). *See also In re Edwards,* 808 A.2d 476, 482 (D.C.2002). However, "[i]n the final analysis, the responsibility to discipline lawyers is the court's." *Id.* at 482 (quoting *In re Shillaire,* 549 A.2d 336, 342 (D.C.1988) (*Shillaire I*)). We "review *de novo* any Board determination of moral turpitude, since the ultimate issue of moral turpitude is one of law rather than of fact." *In re Tidwell,* 831 A.2d 953, 957 (D.C.2003) (quoting *In re Kerr,* 611 A.2d 551, 553 (D.C.1992)) (other citation and internal quotation marks omitted).

### A Misdemeanor (Serious or Non-serious) and A Crime of Moral Turpitude

■ When a member of the District of Columbia Bar is convicted of a crime of moral turpitude *per se,* disbarment is automatic. *See Tidwell, supra,* 831 A.2d at 957; D.C.Code § 11–2503(a).[4] Conviction

---

4. Section 11–2503(a) provides:

When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice. Upon reversal of the conviction the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the

of a "serious crime" within the meaning of D.C. Bar R. XI, § 10 may lead to a determination that the crime is one of moral turpitude *per se*, but a misdemeanor, even one characterized as a "serious crime" does not involve moral turpitude *per se*.[5] As we declared in *In re McBride*, 602 A.2d 626 (D.C.1992) (en banc) (*McBride II*): "[N]o conviction of a misdemeanor may be deemed a conviction of a crime involving moral turpitude *per se*, even though that misdemeanor may be properly characterized as a 'serious crime,' ... and may be held to involve moral turpitude on the facts of the case." *Id.* at 629. Stated differently, although certain crimes, including misdemeanors, may not be denoted crimes of moral turpitude *per se*, they may constitute crimes of moral turpitude under "the circumstances of the transgression." *McBride II*, 602 A.2d at 635. That is, a hearing may be held to determine whether a misdemeanor crime may be characterized as one of moral turpitude on the facts of the case. *Id.* at 629 ("[W]e do hold that in all instances where the legislature has seen fit to limit punishment for a crime to the misdemeanor range, a lawyer convicted of a misdemeanor, including one with an 'intent to defraud,' shall be entitled to a hearing on whether that crime, on the facts, involves moral turpitude.").

▪ *In re Colson*, 412 A.2d 1160 (D.C. 1979) (en banc) and other cases provide insight into the legal determination as to whether a misdemeanor offense rises to the level of moral turpitude, a "term ... [which] has less than a finite definition." *Id.* at 1167. "[T]his court adopted a dictionary definition of moral turpitude" in *Colson. Tidwell, supra*, 831 A.2d at 957; moral turpitude is:

> An act of baseness, vileness or depravity in the private and social duties which a man [or a woman] owes to his [or her] fellow men [or women] or to society in general, contrary to the accepted and customary rule of right and duty between man [or woman] and man [or woman].

*Colson, supra*, 412 A.2d at 1168 (quoting 2 BOUV. LAW DICTIONARY 2247 (Rawle's Third Revision)). We also said: "If a crime is one involving moral turpitude, it is because the act denounced by the statute offends the generally accepted moral code of mankind"; *id.* at 1168, and we referenced the statement in BLACK'S LAW DICTIONARY 1160 (4th ed.1951) "that moral turpitude is [conduct] contrary to justice, honesty, modesty or good morals." *Colson*, 412 A.2d at 1168. *McBride II, supra*, elaborates on the notion that an act proscribed by statute rises to moral turpitude if it "offends the generally accepted moral code of mankind": "Thus, the idea of moral turpitude incorporates a

---

member of the bar so convicted shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment.

D.C.Code § 11–2503(a) (2001).

5. Under D.C. Bar R. XI, § 10(d), if "an attorney has been found guilty of a serious crime ..., Bar Counsel [is required to] initiate a formal proceeding in which the sole issue to be determined shall be the nature of the final discipline to be imposed." D.C. Bar R. XI, § 10(b) defines a "serious crime" as follows:

The term "serious crime" shall include (1) any felony, and (2) any other crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."

revulsion of society toward conduct deeply offending the general moral sense of right and wrong." *Id.*, 602 A.2d at 632–33. Under the *Colson* and *McBride II* analysis of whether a crime or offense is one of moral turpitude, then, we examine whether the prohibited conduct is base, vile or depraved, or whether society manifests a revulsion toward such conduct because it offends generally accepted morals.

We have never held that conviction of a misdemeanor conflict of interest offense is a serious crime, nor inherently one of moral turpitude.[6] After Mr. Sims' conviction on the charge of misdemeanor conflict of interest, Bar Counsel's office sent a letter to the Clerk of this court. The letter stated in part: "In the absence of a willfulness element, we believe that the offense does not constitute a 'serious crime' as defined by D.C.App. R. XI, § 10(b)." The Chief Judge of this court then issued an order tracking Bar Counsel's language ("does not constitute a 'serious crime' ") and referring the matter to Bar Counsel for investigation and proceedings "as appropriate under Rule XI, § 8." The matter was assigned to Hearing Committee Four. That Hearing Committee determined, in essence, that an attorney convicted of a non-serious crime under D.C. Bar R. XI, § 10(b) may not be disbarred pursuant to D.C.Code § 11–2503(a). Bar Counsel and the Board maintain that even if a misdemeanor crime is denoted "non-serious" or

not a serious crime, a moral turpitude inquiry is permissible for purposes of determining whether an attorney may be disbarred. We have considered whether the moral turpitude inquiry is permissible concerning a misdemeanor, "non-serious" crime in only one prior case, *In re Bewig*, 791 A.2d 908 (D.C.2002). That case concerned a guilty plea by an attorney to misdemeanor sexual contact, in violation of D.C.Code § 22–4106 (1996). A majority division of this court concluded "that the misdemeanor did not constitute a 'serious crime' as defined by D.C. Bar R. XI, § 10(b)." *Id.* Nevertheless, we implicitly saw no bar to a moral turpitude inquiry based on the facts attending the misdemeanor sexual contact charge since "[t]he Board determined that respondent committed a crime of moral turpitude on the facts," and this court adopted the Board's recommendation that the attorney be disbarred. *Id.* at 909.

 Here, we are confronted with a different type of offense, one involving misdemeanor conflict of interest. As to that offense, we see nothing in D.C.Code § 11–2503(a) which proscribes a factual moral turpitude inquiry, even though this court concluded that the offense is not a serious crime. Section 11–2503(a) addresses "an offense involving moral turpitude" and is not limited by characterization of the offense as "serious" or "non-serious." Thus, in this case, under the

---

**6.** Mr. Sims entered a plea of guilty to a one count violation of a federal conflict of interest misdemeanor statute, 18 U.S.C. § 208, which provided in pertinent part:

(a) Except as permitted by subsection (b) hereof, whoever, being an officer or employee of ... the District of Columbia ... participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling

or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child ... or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest-

Shall be subject to the penalties set forth in section 216 of this title.

Section 216 (a) of 18 U.S.C. provides for a penalty of imprisonment "for not more than one year" or a fine.

plain words of the statute, a moral turpitude inquiry is not prohibited. Nor can Rule XI, § 10(b) be asserted as a bar to that inquiry since, as was noted in *In re Colson, supra,* 412 A.2d at 1179 (Ferren, J., concurring), "to the extent that Rule XI conflicts with § 11–2503(a), the rule must yield to the statute." *Id.* at 1179 (Ferren, J., concurring). Consequently, we hold that in the case of a misdemeanor conflict of interest, a non-serious crime, the Board may determine whether or not that offense involves moral turpitude on the facts. Because the Hearing Committee thought it was precluded from making the moral turpitude inquiry, we are constrained to remand this matter to the Board for remand to the Hearing Committee so that it may, in the first instance, determine whether or not Mr. Sims' conduct underlying his guilty plea to misdemeanor conflict of interest constituted moral turpitude.

▮ Upon remand, the moral turpitude inquiry must be based on the existing record made by Bar Counsel. Bar Counsel presented no testimony during Mr. Sims' hearing before Hearing Committee Four; rather, Bar Counsel relied on documentary evidence, including Mr. Sims' statements in court, and the results of the investigation by two FBI agents. The FBI investigative results were presented in an unsigned report rather than an affidavit. That report was based on interviews with at least six individuals; we see no indication in the record that these interview reports were signed under penalty of perjury or sworn.

We now review past cases to distill legal principles applicable to the remand analysis in this case because we have never decided whether a misdemeanor conflict of interest offense involves moral turpitude on the facts presented. We have considered, however, whether other misdemeanor convictions rise to the level of moral

turpitude. The approach we used in those cases will assist the Board on remand to determine whether or not the misdemeanor conviction in this case is one of moral turpitude under § 11–2503(a). Our approach to this question of law involves an examination of the totality of the circumstances concerning the offense. As we declared in *In re Spiridon,* 755 A.2d 463 (D.C.2000):

> Once one accepts that conduct deemed criminal by a society ... may or may not involve moral turpitude, the determination becomes intensely specific to the particular facts and circumstances. Furthermore, the inquiry must be cognizant of the purpose: to determine whether the conviction of the offense in question rises to such a level that the legislature would have intended as a consequence the automatic disbarment of the attorney in question.

*Id.* at 468. Our past attorney discipline misdemeanor conviction cases afford a glimpse into the reasons why an intensely specific inquiry into the particular facts and circumstances of those convictions may or may not lead to a conclusion that the offense is one of moral turpitude requiring disbarment.

One case involved a federal misdemeanor conviction essentially for communication of material, nonpublic information pertaining to a tender offer. *In re Hutchinson,* 474 A.2d 842 (D.C.1984) (*Hutchinson I* ); *In re Hutchinson,* 518 A.2d 995 (D.C.1986)(*Hutchinson II* ); *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc) (*Hutchinson III* ). We concluded in *Hutchinson I* that the misdemeanor conviction was not a serious crime *per se.* 474 A.2d at 843. Nor did Hutchinson's "disclosure of inside information ... constitute 'statutory fraud,' notwithstanding his mis-

demeanor conviction . . . ." *Hutchinson II*, 518 A.2d at 996.[7]

Another of our past misdemeanor conviction cases concerned a plea of guilty entered in federal court to federal charges of unlawful possession of federal insignia (use of a Senator's stationery) and harassment of a federal witness. *In re Shillaire, supra; In re Shillaire*, 597 A.2d 913 (D.C. 1991) (*Shillaire II* ). Ultimately, we sustained "the Board's determination that the offenses of which Shillaire was convicted did not, under all of the circumstances, involve moral turpitude . . . ." *Shillaire II*, 597 A.2d at 917. Initially, we were concerned in *Shillaire I*, with the Board's failure to consider an FBI affidavit which contained information from informants supported by tape recordings, and we remanded the case to the Board for consideration of that affidavit. *Id.* at 343. On remand, the special FBI agent who submitted the affidavit testified and the Board considered the transcripts of Mr. Shillaire's conversations with FBI agents. *Shillaire II*, 597 A.2d at 915.

In *In re McBride*, the attorney was convicted of a federal misdemeanor charge of aiding and abetting a client to commit passport fraud. *In re McBride*, 578 A.2d 1102 (D.C.1990) (per curiam) (*McBride I* ); *In re McBride*, 602 A.2d 626 (D.C.1992) (en banc) (*McBride II* ); *In re McBride*, 642 A.2d 1270 (D.C.1994) (*McBride III* ). We incorporated the Board's report in our order suspending Mr. McBride for one

year without a fitness requirement. That report concluded that the attorney's "acts were not motivated for personal gain," and his "conduct harmed no one and, although misguided, was intended to help a friend." *McBride III, supra,* at 1273. As such, "[h]is conduct did not involve moral turpitude." *Id.*

The attorney in *In re Tucker*, 766 A.2d 510 (D.C.2000) (per curiam) (*Tucker II* ), entered a plea of guilty to one count of misdemeanor attempted bribery. The attorney admitted making six to eight payments to an employee of the BTA to "fix" parking tickets and to make sure that BTA records reflected payment of the tickets. He signed a statement detailing his actions relating to the parking tickets, and gave the statement to the FBI. He was charged with a violation of D.C.Code § 11–2503(a), and a violation of "Rule 3.5(a) (seeking to influence judge or other official); Rule 8.4(a) (violating or attempting to violate Rules), Rule 8.4(b) (committing a criminal act; engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(d) (engaging in conduct that seriously interferes with administration of justice)." *Id.* at 512. To prove its case against Mr. Tucker, Bar Counsel sought and received an order from this court "directing the Federal Bureau of Investigation (FBI) to produce materials relevant to a disciplinary proceeding and to make an FBI agent available to provide related tes-

---

**7.** The Board concluded "that Hutchinson's false statements to the SEC lawyers constituted . . . conduct involving moral turpitude that adversely reflected on his fitness to practice law, in violation of [former rule] DR 1–102(A)(3) [prohibiting an attorney from 'engag[ing] in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law']." *Hutchinson II*, 518 A.2d at 996 n. 1. We also noted that:

> Because the finding of moral turpitude was unrelated to Hutchinson's criminal

conviction, [his] case [did] not present the issue of whether he is subject to disbarment under D.C.Code § 11–2503 (1981).

*Id.* at 999 n. 7. We also held that "[i]n the absence of affirmative proof of a fraudulent intent or state of mind, . . . Hutchinson's misdemeanor conviction did not establish a violation of [former] Rule DR 1–102(a)(4) [prohibiting an attorney from 'engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation']." *Hutchinson III*, 534 A.2d at 923, *Hutchinson II*, 518 A.2d at 996 n. 1.

timony." *In re Tucker*, 689 A.2d 1214, 1214–15 (D.C.1997) (*Tucker I* ). The order authorized the FBI agent to present testimony during Mr. Tucker's hearing before Hearing Committee Four, and to present "audio and video recordings relating to [Mr. Tucker's] alleged attempts to bribe an employee of the District of Columbia government." *Id.* at 1215. Based upon the evidence presented during the hearing, the Hearing Committee determined that "Bar Counsel clearly and convincingly showed that [Mr.] Tucker's conduct involved moral turpitude on the facts because the totality of facts surrounding his conduct involved sufficient intentional dishonesty for the purpose of personal gain." *Tucker II*, 766 A.2d at 512. The Board agreed with the Hearing Committee, and this court adopted the report and recommendation of the Board that Mr. Tucker be disbarred "because there [was] substantial evidence in [the] case to support a finding of moral turpitude." *Id.* at 513.

Finally, in *Spiridon, supra*, both the hearing committee and the Board agreed that an attorney who had been admitted to practice in the District and Maryland, but who had never practiced law, should be suspended for one year with a fitness requirement because of a violation of Rule 8.4(b) of the District of Columbia Rules of Professional Conduct. Both the hearing committee and the Board concluded, however, that Mr. Spiridon's conviction of misdemeanor theft was not an " 'offense involving moral turpitude,' " *id.* 755 A.2d at 464, essentially because the total amount of money taken from a fare box while he was driving a bus at night amounted to only $18.00, and because of the testimony of doctors concerning the attorney's mental state, including that of a psychiatrist who had "diagnosed [Mr. Spiridon] as suffering from schizoaffective disorder, alcohol abuse, and adjustment disorder with mixed anxiety and depressed mood ...." *Id.* at 465.

From these cases, we distill the legal principles that guide the analysis of Mr. Sims' misdemeanor conflict of interest conviction, and the determination as to whether his conduct underlying that conviction involves moral turpitude on the facts. Bar Counsel has the burden of showing by clear and convincing evidence that an attorney's conduct involves moral turpitude on the facts. *See Tucker II, supra*, 766 A.2d at 512; BPR Rule 11.5 ("Bar Counsel shall have the burden of proving violations of disciplinary rules by clear and convincing evidence"). To rise to the level of moral turpitude, an attorney's conduct must be an act of "baseness, vileness or depravity," *Tidwell, supra*, 831 A.2d at 957, or be the type that manifests "a revulsion of society toward conduct deeply offending the general moral sense of right and wrong." *McBride II, supra*, 602 A.2d at 632–33. Clear and convincing evidence relating to conduct underlying a criminal conviction may include an FBI or other law enforcement affidavit, *Shillaire I, supra*, 549 A.2d at 343; a statement given to the FBI or other law enforcement agency and signed by the attorney, *Tucker II, supra*, 766 A.2d at 513; audio or videotapes made by an FBI agent or other law enforcement official showing the attorney in an act of wrongdoing, *Tucker I, supra*, 689 A.2d at 1215; testimony by an FBI agent or other law enforcement official before the hearing committee, *id.;* and admissions of the attorney who is subject to discipline, *id.* at 1217.

In addition, the actions of the attorney must be motivated by personal gain or manifest intentional dishonesty for the purpose of personal gain, *Tucker II*, 766 A.2d at 512, rather than be simply "misguided" actions, *McBride III*, 642 A.2d at 1273. And, psychiatric or other medical

testimony may show that an attorney's mental state precludes a finding of intentional dishonesty for personal gain, *Spiridon, supra,* 755 A.2d at 465.

Because the Hearing Committee and the Board have not had an opportunity to review this case under the legal principles set forth in this opinion, we remand this matter to the Board with instructions to remand it to the Hearing Committee for a determination on the existing record in this case as to whether or not Mr. Sims was convicted of an offense involving moral turpitude on the facts. Thereafter, the Board shall submit a revised report and recommendation within 60 days of the effective date of the court's order.

*So ordered.*