Michael S. Frisch, Asst. Bar Counsel, Washington, D.C., entered an appearance for petitioner, Office of Bar Counsel.

Robert S. Litt, Washington, D.C., entered an appearance for respondent.[*]

**In the Matter of George L. SHILLAIRE III, Respondent.**

No. 86–848.

District of Columbia Court of Appeals.

Oct. 8, 1991.

Before ROGERS, Chief Judge, TERRY and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

This case is before us for the second time. Following our decision in *In re Shillaire*, 549 A.2d 336 (D.C.1988) (*Shillaire I*), the Board on Professional Responsibility (the Board) has recommended once again that reciprocal discipline be imposed and that Shillaire be suspended for one year commencing October 31, 1986. The Board has further suggested that Shillaire be required to furnish proof of rehabilitation as a condition of reinstatement. We adopt the Board's recommendation.

I

The prior history of this unfortunate case is described in detail in *Shillaire I*. Briefly, Shillaire was an attorney admitted to practice in Michigan and in the District

---

[*] No briefs were filed in this court. Named counsel appeared before the Board on Professional Responsibility.

when he engaged in the offensive and criminal conduct which has resulted in discipline in both jurisdictions. On March 13, 1986, he entered a plea of guilty in the United States District Court for the Eastern District of Michigan to misdemeanor violations of 18 U.S.C. § 701 (unlawful possession of Federal insignia) and 18 U.S.C. § 1512(b) (harassment of a Federal witness). More serious felony charges against him were dismissed as part of a plea agreement.

The harassment charge arose out of an incident in which Shillaire made threatening remarks in the federal courthouse to one Daniel Adler, a former client who has an extensive criminal record, and who provided information to the Department of Justice which led to Shillaire's indictment. The prosecution also proffered an affidavit by Special Agent Justin G. Fox of the FBI alleging that Shillaire had made remarks to third parties indicating his hatred for Adler and his disposition to do him harm or even to kill him. According to the Fox affidavit, some of the conversations in which Shillaire made these comments were secretly tape-recorded by the third parties who, unbeknownst to Shillaire, were providing information to the FBI. During the plea proceedings, Shillaire did not respond specifically to the Fox affidavit. He acknowledged to the judge, however, that he had made statements to a third party which "could have been construed" as suggesting that Shillaire intended to inflict bodily harm upon Adler.

Following his plea and a psychiatric examination, Shillaire was placed on probation and ordered to pay restitution. As a result of his conviction, disciplinary proceedings were instituted against him in Michigan, and he was suspended from practice in that State for one year. Under the terms of the Michigan disciplinary order, Shillaire was required to reapply for admission before being permitted to practice again.

Disciplinary proceedings were also instituted against Shillaire in the District of Columbia. Following his conviction, this court suspended him from practice pending further investigation, and the matter was referred to the Board in conformity with *In re Colson*, 412 A.2d 1160 (D.C.1979) (en banc), for a determination whether Shillaire's crimes involved moral turpitude. The Board, in turn, referred the matter to a Hearing Committee.

Before the Committee, the case was presented on stipulated facts. Bar Counsel did not present the Fox affidavit, and Shillaire did not testify. Both Bar Counsel and Shillaire recommended the imposition of reciprocal discipline, and Bar Counsel made no claim that the harassment offense involved moral turpitude. The Hearing Committee nevertheless concluded, in what we described as a "thoughtful and comprehensive opinion," *Shillaire I, supra*, 549 A.2d at 341, that the harassment offense involved moral turpitude. If that finding had been upheld, it would of course have required disbarment. *Colson, supra*, 412 A.2d at 1164. On review of the Committee's determination, the Board concluded that the limited record before it

> does not support a finding, by clear and convincing evidence, that Respondent possessed either the intent to prevent Mr. Adler from testifying or the intent that his remarks to third parties be communicated to Mr. Adler.

The Board therefore recommended that reciprocal discipline be imposed, and that Shillaire be suspended from practice for one year on terms similar to those ordered in Michigan.

Neither Bar Counsel nor Shillaire submitted any opposition to the Board's original Report and Recommendation. This court, however, remanded the case for further proceedings. We held, *inter alia*, that it was error for the Board not to consider the contents of the Fox affidavit. *Shillaire I, supra*, 549 A.2d at 343–45. We also expressed the view that on the limited record before the Board, the evidence of moral turpitude was "formidable." *Id.* at 346. We concluded as follows:

> Although it is frankly difficult for us to discern how, on the basis of the record as a whole as it now stands, a finding of no moral turpitude could be sustained, we nevertheless think it appropriate to give

the Board another opportunity to assess the evidence in conformity with the legal principles which we have expounded here. Accordingly, we remand the case to the Board of Professional Responsibility for further proceedings consistent with this opinion.

*Id.*

## II

Following our remand, the matter was again referred to the Hearing Committee. The second time, however, the Committee was able to develop a far more comprehensive record. Both Special Agent Fox and respondent Shillaire testified,[1] and the transcripts of Shillaire's conversations with FBI informants were also made available. In a second thorough, thoughtful, and balanced opinion, this one totalling eighty-five pages, the Committee found (contrary to its earlier conclusion on the previous and more limited record) that it had not been demonstrated by clear and convincing evidence that the harassment offense involved moral turpitude.

The Committee concluded with respect to the courthouse incident that Adler had probably baited Shillaire, and that Shillaire had reacted in anger. In the words of the Committee,

> the message sent could just as easily have been, "well, you want to get a rise out of me, you succeeded and you can bait me into making threats by mocking me face-to-face." That message is different from conveying a threat of retaliation for testimony, and would not support a finding of moral turpitude under the foreseeability test as we understand it. Since Bar Counsel must clearly and convincingly prove [that] a message of intimidation was sent in this incident, Bar Counsel's case would fail if Adler had engaged in baiting behavior.

With respect to Shillaire's intemperate remarks to third parties which were the subject of the Fox affidavit, the Hearing Committee found a lack of "clear and convincing evidence" that Shillaire intended

that his threats be communicated to Adler. The Committee reached this conclusion

> because these were private conversations of a man in his office, so obviously raging in an out-of-control fashion against his perceived *bête noir*. We should think that, in the privacy of one's home or office, many criminal defendants—lawyers or laymen alike—have raged on in the most intemperate manner, elaborating on the vengeance they would wreak on their accusers some day. Were the government to wiretap all such defendants in such surroundings, many 'vile' and 'depraved' portraits could be painted of these lawyers and laymen. But there would be recognition that, as a matter of common sense, these defendants may be simply ventilating their rage in private, rather than manifesting an actual intent to convey a retaliatory threat to the accuser. The former inference, respecting these conversations, is at least as plausible as the latter inference. Therefore, in our judgment Bar Counsel's case fails on this score as well.

On April 26, 1991, the Board issued its second Report and Recommendation. The Board

> concluded that it can do no better than to adopt and incorporate by reference the Hearing Committee's comprehensive and well-reasoned report. Neither Respondent nor Bar Counsel has filed exceptions to that Report. For the reasons stated in the Report, the Board recommends that the [c]ourt adopt the Hearing Committee's finding of no moral turpitude on the harassment offense.

Neither party has objected in this court to the Report and Recommendation of the Board. Bar Counsel specifically eschewed any claim that the circumstances of the harassment offense showed moral turpitude.

## III

As we noted in *Shillaire I, supra*, 549 A.2d at 342–43, the scope of our review of

---

1. The Committee also heard testimony by telephone from a Michigan attorney called by Shillaire.

the Board's findings is limited. *See* D.C. Bar R. XI § 9(g). When the case was before us for the first time, the reasons for us to defer to the Board were significantly less compelling than now. The Board had then rejected the views of the Hearing Committee on the issue of moral turpitude. Moreover, "all three bodies—the Committee, the Board, and the court—[were] dealing entirely with a paper record." *Shillaire I, supra,* 549 A.2d at 341. This time around, however, the Board has upheld the findings of the Committee, and these findings turn in substantial part on credibility determinations which we are in no position to second-guess.

We should note that the Committee's view that moral turpitude was not shown in connection with the harassment offense is not necessarily the only reasonable conclusion consistent with the evidence. The statute which Shillaire was found guilty of violating provides in pertinent part that

whoever intentionally harasses another person and thereby hinders, delays, prevents or dissuades any person from ...

testifying in an official proceeding ... or attempts to do so, shall be ... fined ... or imprisoned ... or both.

18 U.S.C. § 1512(b)(1). The superseding indictment to which he entered a plea of guilty charged that Shillaire intentionally harassed and attempted to harass Adler, "thereby to hinder, delay, prevent and dissuade Adler from attending and testifying in an official proceeding and from assisting in a criminal prosecution and proceeding." Shillaire's plea thus suggests an intent more culpable than that which he professes that he entertained at the time.[2]

Moreover, when interviewed by Special Agent Fox shortly after the courthouse incident, Shillaire made no claim that he had been baited. In a recorded conversation with an FBI informant approximately nine months later, Shillaire described the encounter and his feelings related to it quite vividly without any allusion to baiting by Adler.[3] We agree with the Committee that if there had been no baiting,

[t]he natural and probable consequences of respondent's behavior would then

---

**2.** It does not appear, however, that Shillaire was specifically interrogated at the time of his plea as to whether he intended to hinder or dissuade Adler from testifying. He admitted that "the gesture and my facial expressions and the comments that I made, I would say certainly would cause a harassment of a federal witness." But Shillaire claimed then, as he claims now, that Adler made a mocking face and gesture to which he (Shillaire) responded by giving Adler "the finger" and by making a threatening remark.

**3.** A transcript of this remarkable conversation between Shillaire (referred to as Respondent) and one Stubenrauch, a former employee who was acting as an informant, includes the following:

Respondent: [Adler's] so scared of me you couldn't believe it. Saw him in the hallway downtown and he ran right to the Feds, tell 'em I was gonna kill him.
Stubenrauch: Um.
Respondent: Says, it's the only true statement he's made since I've known him.
Stubenrauch: Um.
Respondent: I'm gonna put him down myself.
Stubenrauch: Well.
Respondent: It's a question of time. So when everything's settled and the dust is cleared, ya know?
Stubenrauch: Huh.

Respondent: Go one bullet hole in each knee and each elbow, then I'll cut his tongue out. Ya know I'm serious?
Stubenrauch: I dunno.
Respondent: Put a gun to his head, and I'll have a knife, tell him to cut his dick off and eat it.
Stubenrauch: (Laughs). My, my, George. You're getting into (unintelligible).
Respondent: What, you don't think I would?
Stubenrauch: Huh?
Respondent: You don't think I would?
Stubenrauch: No.
Respondent: I would. In a minute. The man's fucked with me. I don't like people fuckin' with me. I don't like people fuckin' with my license to practice law. An' I don't like three people fuckin' ... a million dollar business up, and anything else. And I'm supposed to let him get away with it? Ya think I, ya think I got to where I am because I'm the kinda person who lets people get away with anything.
Stubenrauch: No, but ...
Respondent: But what?
Stubenrauch: Figure, ya know, God figures, ya know, get what you get, ya know. So he'll get his due.
Respondent: Yeah.
Stubenrauch: Right?
Respondent: I'm gonna give it to him, too.
Stubenrauch: Uh.
Respondent: I'm gonna make sure.

have been that Adler would get a message of retaliation for testimony; under the foreseeability test, respondent then would have actually intended to intimidate Adler at that moment, and would be chargeable with moral turpitude.

 But the Committee carefully considered the possible inferences unfavorable to Shillaire which could be drawn from Shillaire's after-the-fact descriptions of the incident, as well as Shillaire's testimony that he acted from anger as a result of Adler's having taunted him by making a mocking face. The Committee concluded that

> from the perspective of the record there are now good reasons for believing or disbelieving respondent's claim on the 'mocking face' issue. Having observed respondent's demeanor, we credit his testimony on this point.

The Committee's finding in this respect, and the Board's concurrence in it, are supported by substantial evidence on the record as a whole. Accordingly, that finding, which the Committee reasonably viewed as critical to the "no moral turpitude" determination, must be sustained. *See Shillaire I, supra,* 549 A.2d at 342–43, and authorities cited.

### IV

 Since we uphold the Board's determination that the offenses of which Shillaire was convicted did not, under all of the circumstances, involve moral turpitude, we agree with the Board that reciprocal discipline is the appropriate sanction. *See* D.C. Bar R. XI, § 11(c). It appears to be undisputed that Michigan's suspension of Shillaire for one year, with a requirement that he reapply for admission, was "within the range of sanctions that would be imposed [in this jurisdiction] for the same misconduct."[4] *See In re Garner,* 576 A.2d 1356, 1357 (D.C.1990) (per curiam). Accordingly, we impose the same discipline, commencing

---

4. Shillaire was readmitted to the Michigan Bar in May 1989. The protracted proceedings in this case have resulted in his *de facto* suspension in the District for several years. Nevertheless, we believe that his conduct as reflected in this record was extremely serious and came

on October 31, 1986, but require that Shillaire furnish proof of rehabilitation as a condition of being reinstated to the practice of law in the District of Columbia. *See* D.C. Bar R. XI, § 16.

*So ordered.*

---

close to demonstrating moral turpitude. Accordingly, although it may well be that Shillaire has now been sufficiently rehabilitated to warrant reinstatement, even the unfortunate lapse of time since 1986 should not make that determination automatic.