In re Nathaniel SIMS, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals.

No. 98–BG–1384.

District of Columbia Court of Appeals.

Nov. 10, 2004.

Joyce E. Peters, Bar Counsel, with whom Elizabeth A. Herman, Senior Assis-tant Bar Counsel, was on the motion to vacate remand order, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attor-ney, was on the petition for rehearing and response to the motion of Bar Counsel to vacate remand order, for the Board on Professional Responsibility.

Samuel McClendon was on the motion for leave to file substitute motion in oppo-sition to Bar Counsel's motion to vacate court order, for respondent.

Before TERRY and REID, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

This case is before us a second time. When we last considered it, we said that Nathaniel Sims ("Sims") had pled guilty to conflict of interest under 18 U.S.C. §§ 208 and 216(a)(1), a misdemeanor offense, which had been determined to be a non-serious misdemeanor. *In re Nathaniel Sims*, 844 A.2d 353, 357 (D.C.2004)("*Sims I*"). After receiving notice of Sims's con-viction, Bar Counsel filed a specification of charges alleging that his conduct violated Rules 8.4(b), 8.4(c), and 8.4(d) of the Dis-trict of Columbia Rules of Professional Conduct, and also that his conviction for a crime of moral turpitude constituted grounds for disbarment pursuant to D.C.Code § 11–2503(a). The hearing com-mittee found a violation of Rules 8.4(b), 8.4(c), and 8.4(d), but concluded, as a mat-ter of law, that a non-serious misdemeanor could never support a finding of moral turpitude. The Board disagreed on the latter point, ruling that on the facts pre-sented Sims's conduct constituted moral turpitude.

In *Sims I* we held that this non-serious misdemeanor could constitute an offense involving moral turpitude, depending on

the underlying facts. We then directed the Board to remand the case to the hearing committee, to permit it to determine if the facts adduced at the hearing were sufficient to establish that Sims's conduct constituted moral turpitude under the standards we set forth. (*See In re Tucker*, 766 A.2d 510, 513 (D.C.2000); *In re Sneed*, 673 A.2d 591, 594 (D.C.1996); *In re McBride*, 602 A.2d 626, 632 (D.C.1992) (en banc); *In re Colson*, 412 A.2d 1160 (D.C. 1979) (en banc)).

Bar Counsel has moved to vacate our remand order advising that the hearing committee that originally conducted the hearing is no longer constituted, and that it would be impossible to reconstitute the original committee because two of the members that conducted the hearing are no longer on any hearing committee. Bar Counsel argues that our order would necessitate a remand on a closed record to a new hearing committee which would undermine the disciplinary system's policy of having hearing committees make factual determinations in the first instance, including consideration of the demeanor of the witnesses. *In re Micheel*, 610 A.2d 231, 237 (D.C.1992).

We agree with Bar Counsel that, because the original hearing committee is no longer in existence, a remand to a hearing committee is not practicable. Accordingly, we grant the motion to vacate the order to remand and reach the issue of whether Sims's conduct constitutes moral turpitude.[1] We conclude, as did the Board, that Sims's conduct constituted moral turpitude, and accordingly order that Sims be disbarred.

Sims pleaded guilty to one count of conflict of interest, 18 U.S.C. § 208, a misdemeanor. In *Sims I*, we said that "although certain crimes, including misdemeanors [whether determined to be 'serious' or 'non-serious'], may not be denoted crimes of moral turpitude *per se*, they may constitute crimes of moral turpitude under 'the circumstances of the transgression.'" 844 A.2d at 361 (quoting *In re McBride, supra,* 602 A.2d at 635). We have defined moral turpitude as an act that (1) offends the generally accepted moral code of mankind; (2) is one of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted customary rule of rights and duties between man and man; or (3) is conduct contrary to justice, honesty, modesty or good morals. *Colson*, 412 A.2d at 1168 (citations omitted).[2]

---

1. In its response to Bar Counsel's motion the Board also requested vacatur of the remand order agreeing with Bar Counsel's position that the matter should not be remanded to the hearing committee. The Board argued, however, that it should be given an opportunity to issue a new recommendation consistent with our opinion in *Sims I*. We decline to take that course because we are satisfied that the Board has already issued a Report and Recommendation that was consistent with the legal principles we set forth in *Sims I*. Accordingly, while we are mindful of the Board's important role in assisting the court in deciding disciplinary cases, we conclude that there is no reason for the Board to consider this case further.

2. In *Sims I*, we further examined the concept of moral turpitude and noted, *inter alia*:

> *In re Colson*, 412 A.2d 1160 (D.C.1979) (en banc) and other cases provide insight into the legal determination as to whether a misdemeanor offense rises to the level of moral turpitude, a "term ... [which] has less than a finite definition." *Id.* at 1167. "This court adopted a dictionary definition of moral turpitude" in *Colson. Tidwell, supra*, 831 A.2d at 957; moral turpitude is:
> An act of baseness, vileness or depravity in the private and social duties which a man [or a woman] owes to his [or her] fellow men [or women] or to society in general, contrary to the accepted and

The Board concluded that Sims's "repeated abuse of the trust placed upon him as a government employee in order to benefit himself financially satisfies the *Colson* criteria for moral turpitude". We are satisfied that the Board's Report and Recommendation was consistent with the legal principles we set forth both in *Sims I* and in this opinion, and therefore, we will defer to the Board's recommendations. *See In re Romansky*, 825 A.2d 311, 318 (D.C.2003); *In re Goffe*, 641 A.2d 458, 463–64 (D.C.1994); *In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987) (en banc); *In re Haupt*, 422 A.2d 768, 771 (D.C.1980).

The hearing committee found that during the period when the conduct in question occurred Sims was employed by the District of Columbia Bureau of Traffic Adjudication ("BTA") as a hearing examiner. In that capacity, Sims would hear disputes relating to violations of parking laws. While he had the authority to dismiss citations brought before him, BTA had a policy that prohibited a hearing examiner from adjudicating a ticket which he or a member of his family had been issued. The hearing committee's factual findings included the following:

> The [FBI] investigation revealed that on 20 occasions between October 5, 1995 and January 31, 1997, [Sims] dismissed citations issued to vehicles registered to him, his wife, and two of his daughters. [Sims] effected the dismissals by logging into the BTA computer system with his identification code and secret password. With respect to a majority of those tickets, he used a disposition code for the dismissed tickets that reflected that a hearing examiner other than himself adjudicated the tickets.
>
> As a result of these actions by [Sims], he and his family avoided paying fines and late penalties in the amount of $ 1,280.

*Sims I, supra,* 844 A.2d at 358.

After conducting a hearing where it examined witnesses, including Sims, and considered documentary evidence, the hearing committee concluded that Sims had violated Rules 8.4(b), 8.4(c), and 8.4(d) and found that he dismissed a large number of tickets in which he or members of his family had a personal financial interest; that Sims acted for his own personal enrichment; that he did so in his official capacity; that the conduct occurred over an extended period of time; that Sims was familiar with the Board of Traffic Adjudication ("BTA") policy of precluding adjudication of matters that affect BTA employees; that Sims's acts were not the result of inexperience or a proven psychological condition. Sims did not contest the facts underlying these acts. Finally, although Sims testified that he had not used the disposition codes of *other* adjudicators to dismiss some of the tickets, the hearing committee found that the evidence clearly indicated that Sims had in fact used the disposition codes of the other adjudicators.[3]

The facts and circumstances of this case are very similar to those in *In re Tucker,*

---

customary rule of right and duty between man [or woman] and man [or woman]. *Sims I, supra,* 844 A.2d at 361 (quoting *Colson, supra,* 412 A.2d at 1168 (quoting 2 BOUV. LAW DICTIONARY 2247 (Rawle's Third Revision))). For further discussion of this court's moral turpitude standards, *see Sims I,* 844 A.2d at 361–62.

3. The Board concluded that Sims dismissed a large number of tickets in which he or his family had a personal financial interest; that he acted for his own enrichment; that he acted in his official capacity; that his conduct took place over a long period of time; and, that he was aware that his conduct was inconsistent with BTA policy.

*supra,* 766 A.2d at 510.[4] In *Tucker,* an attorney was convicted of attempted bribery, a misdemeanor, for engaging in a pattern of behavior designed to "fix" parking tickets. Tucker paid money to an official employed in the traffic violation adjudication department who, as part of his official authority, manipulated the computer records to make it appear that the tickets had either been paid in full or were never issued. Tucker paid the money to the employee in his personal capacity which meant the District was deprived of funds to which it was entitled. The Board found that Tucker's misconduct was "so at odds with his responsibility as a citizen and member of the bar that it deeply offended the general moral sense of right and wrong." *Id.* at 512.

In *Tucker,* the hearing committee found and we agreed, that the attorney's actions clearly involved "intentional dishonesty for personal gain" and that under our case law such a finding constituted moral turpitude. *See In re Sneed,* 673 A.2d at 594 (citing *In re Untalan,* 619 A.2d 978, 979 (D.C.1993); *In re Shorter,* 570 A.2d 760, 765 (D.C. 1990); *In re Kent,* 467 A.2d 982, 984 (D.C. 1983)). We concluded that the attorney's conduct warranted disbarment.

The facts in *Tucker* are essentially the same as what occurred here: the underlying conduct in both cases involved an attorney engaging in a scheme to "fix" multiple parking tickets, and, in both cases the attorney was convicted of a misdemeanor. The only difference between the cases is that in *Tucker* the attorney paid a BTA employee to modify the computer records, while here Sims, as the BTA employee, manipulated the records himself for his own gain. We see no real distinction in the nature of the conduct involved. Therefore, we conclude that Sims's conduct, like Tucker's, involved moral turpitude.

Our dissenting colleague argues that the disposition in this case is inconsistent with two other cases where the attorneys were convicted of misdemeanors, but there was no finding of moral turpitude. *See In re Abrahamson,* 852 A.2d 949 (D.C.2004); *In re McBride,* 642 A.2d 1270 (D.C.1994) (*McBride III* ). We do not agree. The facts in those cases were significantly different from what occurred here. For example, as a government employee with adjudicative responsibilities, Sims held a position of considerable trust—a trust he violated repeatedly. In contrast, there was no special trust placed in either Abrahamson or McBride. Moreover, Sims's misconduct occurred at least 20 times while the misconduct of both Abrahamson and McBride consisted of a single incident. Finally, the Board found that Sims acted "to benefit himself financially," while Abrahamson had "no personal motivation to profit," and McBride's "acts were not motivated for personal gain." We think these distinctions are sufficient to support the conclusion that Sims's conduct amounted to moral turpitude while the conduct of Abrahamson and McBride did not.

There is no dispute that Sims knowingly and illegally eliminated parking citations from BTA's computer system so that he would be spared parking fines in the amount of $1280. His conduct constitutes an abuse of the trust placed upon him as a

---

4. The offense of conviction in *Tucker* was a serious misdemeanor, while the offense of conviction in the instant case was determined to be a non-serious misdemeanor. In *Sims I,* we held that there was no *per se* legal bar to a finding that a non-serious misdemeanor could involve moral turpitude. *See also In re Bewig,* 791 A.2d 908 (D.C.2002) (moral turpitude finding made where conviction offense was a non-serious misdemeanor). We concluded that the determination of moral turpitude will be made on the facts, and because the facts of this case are so similar to those in *Tucker,* we look closely at that case for guidance.

government employee. Under the standard set out in *Colson,* the conduct in question was "contrary to justice, honesty, modesty or good morals,"and therefore constitutes moral turpitude on the facts. *Colson,* 412 A.2d at 1168. Accordingly, it is hereby

ORDERED that Nathaniel Sims is disbarred from the practice of law in the District of Columbia, and his name shall be stricken from the roll of attorneys authorized to practice before this court.

*So ordered.*

REID, Associate Judge, dissenting:

"Our purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney. . . ." *In re Steele,* 630 A.2d 196, 200 (D.C.1993); *see also In re Bettis,* 855 A.2d 282 (D.C.App.2004). Rather, in administering our disciplinary system, we impose sanctions to protect "the legal profession, the courts, and the public," *In re Lenoir,* 604 A.2d 14, 15 (D.C.1992). We also emphasize "the continued and restored fitness of an attorney to practice law." *Bettis, supra.*

I part company with my colleagues in this matter and respectfully dissent, in part because in my view Mr. Sims has been punished and that punishment undoubtedly will end his career. The period of disbarment is at least five years, and generally the reinstatement process takes a minimum of an additional eighteen months. *See* D.C. Bar R. XI, § 16(c); *In re Wiley,* 697 A.2d 406, 407 (D.C.1997); *Steele, supra,* 630 A.2d at 202 (Farrell, J., concurring). For a person of Mr. Sims' age a period in excess of six years undoubtedly will preclude his resumption of legal practice. Equally important, I believe that the disposition of Mr. Sims' case is inconsistent with at least two others involving underlying criminal misdemeanor convictions, and as I discuss later, I do not consider *In re Tucker,* 766 A.2d 510 (D.C. 2000) (*Tucker II* ), as controlling the outcome of Mr. Sims' case. And, I cannot on this record and in light of our case law agree that Mr. Sims was convicted of a crime of moral turpitude on the facts.

Mr. Sims' case stands in sharp contrast to that of the respondent in *In re Abrahamson,* 852 A.2d 949 (D.C.2004).[1] There,

1. In attempting to distinguish the cases of Mr. Abrahamson and Mr. McBride from that of Mr. Sims, the majority ignores the factual underpinnings of Mr. Abrahamson's case, the "trust" aspects of both Mr. Abrahamson's and Mr. McBride's cases, and selectively reads the records of Mr. Abrahamson's case and that of Mr. Sims with respect to the element of personal benefit. Factually, Mr. Abrahamson originally was indicted with four others in 1998 on charges of conspiracy, equity skimming, misappropriation of federal funds, and obstruction of federal audits, all as a result of a scheme by those indicted to divert federal funds to their own personal use. The scheme is outlined in the body of this dissent. Mr. Abrahamson was able to plea bargain these charges into a single superseding misdemeanor charge; Mr. Sims also entered a plea to a single misdemeanor charge. As part of the settlement of his case, Mr. Abrahamson agreed to confess judgment in the amount of

$30,000.00, and to pay a $25.00 assessment. Mr. Sims, in contrast, paid $1,280.00 for the "fixed" parking tickets that had been issued to him and other members of his family, a $500.00 fine and a $25.00 assessment. Unlike Mr. Abrahamson with respect to the $30,000.00, Mr. Sims paid the $1,280.00 prior to his plea of guilty. Mr. Abrahamson was sentenced in federal court to one year of probation, with a condition of four months of home detention, while Mr. Sims was sentenced to eighteen months of probation, with no home detention. The underlying records in the two cases show that Mr. Sims' fixed twenty parking tickets issued to him and members of his family, and that Mr. Abrahamson obstructed a federal investigation and audit of federal funds, and received compensation paid with these federal funds for at least a ten-month period, all as part of a fraudulent scheme to divert federal funds. Mr. Sims' position involved trust as the ma-

Mr. Abrahamson entered a plea of "guilty to one misdemeanor count of unlawful receipt of compensation with intent to defeat the purposes of the United States Department of Housing and Urban Development in violation of 18 U.S.C. § 1012." *Id.* at 950. We accepted the Board's determination that Mr. Abrahamson's crime was not one of moral turpitude on the facts, and that he did not violate Rule 8.4(c) of the Rules of Professional Conduct. We agreed with the Board; however, that Mr. Abrahamson violated Rules 3.4(a), 8.4(b) and 8.4(d) of the Rules of Professional Conduct. We also accepted that Board's recommendation that Mr. Abrahamson should be suspended from the practice of law for only six months, without a requirement to show fitness as a condition of reinstatement.

Before the superseding misdemeanor information to which he entered a plea of guilty was filed against Mr. Abrahamson, he had been indicted with others on federal felony charges of (1) conspiracy to embezzle, steal, obtain by fraud and misapply property . . . .; (2) equity skimming . . .; (3) misappropriation of federal funds . . .; and (4) obstruction of federal audits . . . . Report and Recommendation of the Board

jority emphasizes, but so did Mr. Abrahamson's. Indeed, he and his colleagues, and the multiple entities they created were entrusted with $52 million in federal low-income housing monies between 1990 and 1997, including $10,000.00 in housing assistance payments each year. At his sentencing hearing, the trial judge asked Mr. Abrahamson to state what he did between March 7, 1996 and September 7, 1997, in relation to the charge against him. He stated that while reviewing records that had been demanded by the United States Attorney's office in Chicago, he "discovered work orders that were clearly false and that a payment had already been made for the work reflected in these invoices." Although he knew that a federal audit was in progress, he "pulled" the false work orders, did not turn them over, and did not inform the United States Attorney that he had withheld them, "even though they had been previously paid." He admitted that he "knew that [withholding the false orders] would impede the United States Attorney's office and HUD in [the] audit of [a specified housing project]," and that he "continued to receive compensation from . . . a company having an identity of interest with the owner of [a New York City apartment] which received funds from HUD." He also admitted that he "made a deliberate decision not to investigate whether that project, which was also owned and operated by [two persons who were originally indicted with him], was also submitting work orders for work which was not done," and that he "continued to receive compensation from this company until September 9th of 1997." Mr. Abrahamson was in as much of a position of special trust as was Mr. Sims, perhaps even more so because he and his colleagues were entrusted with millions of dollars earmarked to benefit low-income housing tenants. Mr. McBride also was in just as much a position of trust when he represented a client in a passport matter before a federal agency, but assisted his client in committing passport fraud. Finally, I address the "benefit, personal motivation to profit" factor with respect to Mr. Sims in the body of the dissent. Even though Mr. Abrahamson admitted in federal court that he withheld false work orders that were paid with HUD funds from the United States Attorney's office and the HUD auditors, and continued to receive compensation from HUD funds, the Board and the majority do not attribute a motivation for personal gain or benefit to him. Instead, they apparently accept at face value his statement at his disciplinary hearing that, despite his plea to the charge of "unlawful receipt of compensation with intent to defeat the purposes of the United States Department of Housing and Urban Development in violation of 18 U.S.C. § 1012," he "had [no] intention to defeat the purposes but that was what [he] had to plead guilty to, to basically get on with my life. I mean, I was nearly bankrupt. I had to take care of my family . . . ." Why the Board did not accept at face value Mr. Sims' explanation, as it did with respect to Mr. Abrahamson, simply is not clear. In short, factually as well as with respect to the trust and motivation factors, I believe the disposition of Mr. Sims' case is inconsistent with those of Mr. Abrahamson in particular, and Mr. McBride.

on Professional Responsibility in *In re David Abrahamson*, Bar Docket No. 201–01, (May 20, 2004) at 3. The charges grew out of the operation of a realty management company which owned, constructed, maintained and repaired several "low-income housing projects financed by mortgage notes issued by HUD and secured by the housing projects themselves." *Id.* at 4. The management realty company "devised a scheme by which [it] could divert to [its principals] large amounts of money generated by the ... low-income housing projects, even though those projects had no surplus cash." *Id.* at 5. False work orders and invoices were developed to conceal the diverted funds.

Mr. Abrahmson was a shareholder of the realty management company and a partner in four of the low-income housing projects. *Id.* at 6. After he had been placed on notice that the management realty company was engaged in a fraudulent scheme, he received compensation whose source was HUD funds. *Id.* at 10. In addition, when the management realty company hired a law firm to represent it during a HUD audit and evaluation by a United States Attorney's office, Mr. Abrahmson removed fraudulent work orders generated by the company from documents submitted to the law firm representing it in the audit and evaluation. *Id.* at 6–7.

During Mr. Abrahamson's plea proceeding and before he entered a plea of guilty in the United States District Court for the Eastern District of New York, the judge explained what a guilty plea would mean in the context of the charged crime: "You would have had to have acted, that is pulled those work orders not because of any accident or mistake but specifically with the intent in effect to defraud [HUD]." When asked whether he understood that, Mr. Abrahamson said, "Yes, I understand, your Honor." *Id.* at 9. Before the disciplinary hearing committee in his matter, Mr. Abrahamson denied " 'any intention to defeat the purposes [of HUD]' " and maintained that "that was what I had to plead guilty to, to basically get on with my life." *Id.* at 13. Later, however, he acknowledged "that not presenting the[ ] invoices [to the company's law firm and the United States Attorney's office] served to impede the investigation." *Id.*

The Board determined in Mr. Abrahamson's case that under the principles articulated in *In re Colson*, 412 A.2d 1160 (D.C. 1979) (en banc) and *In re Sims*, 844 A.2d 353(D.C.2004)(*Sims I* ) that "[t]he misdemeanor to which [Mr. Abrahamson] pled guilty" did not involve moral turpitude on the facts, as that concept is explained in *Colson*, 412 A.2d at 1168 (D.C.1979) (en banc), and in *Sims I*, 844 A.2d at 365–66. Board Report at 15–16. The Board found that "Mr. Abrahamson removed documents that he determined were fraudulently prepared by his employers from a set of documents that he knew would be provided to the government as 'documentation to justify' or 'invoices that would support' payments previously made by HUD"; "that at the time of this removal action, at least one of his objectives was 'obstructing the HUD investigation' "; and that "[a]lthough he decided to terminate his employment, he continued receiving compensation, provided indirectly by HUD, from his employers until he found another job." Board Report at 16. The Board concluded, however, that "Respondent's conduct ... [did] not offend the 'generally accepted moral code of mankind,' *Colson*, 412 A.2d at 1168[;] [nor did it] involve corruption or threats"; [nor] was "his conduct base, vile, contrary to justice or dishonest[;][and] there was no personal motivation to profit in the manner contemplated by the Court's decisions." Board Report at 17. With respect to the charged violation of Rule

8.4(c), the Board simply concluded: "We agree with the [Hearing] Committee that the evidence in this case does not establish that [Mr. Abrahamson] engaged in conduct that can fairly be described as dishonest, fraudulent or deceitful." Respondent's conduct therefore did not violate Rule 8.4(c). The Hearing Committee found no violation of Rule 8.4(c) because it did not find that Mr. Abrahamson engaged in conduct involving moral turpitude on the facts. Thus, neither the Hearing Committee nor the Board concluded that Mr. Abrahamson violated D.C. Bar R. 8.4(c) because "the evidence ... [did] not establish that [he] had engaged in conduct that can fairly be described as dishonest, fraudulent or deceitful." *Id.* at 18–19.

Nevertheless, the Board found that Mr. Abrahamson violated Rule 8.4(b). *Id.* ("It is professional misconduct for a lawyer to ... commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects.") As the Board stated, Mr. Abrahamson "was convicted of a crime that arose out of his handling of fraudulent documents that had been used to unlawfully obtain money from HUD. He acknowledged that, in returning the documents [to the management realty company], he intended to impede a government investigation." *Id.* at 18. And, the "commission of a crime that is intended to impede an investigation reflects adversely on a lawyer's fitness as a lawyer." Board Report at 18.

Even taking into account the factual distinctions in the development and nature of Mr. Abrahamson's case and that of Mr. Sims, as well as the deference standard which guides our review of the Board's report and recommendation, *see In re Temple,* 629 A.2d 1203, 1207 (D.C.1993), I cannot comprehend the difference in the analysis of the cases with regard to conduct involving moral turpitude on the facts, the violation of Rule 8.4(c), and the respective sanctions imposed on Mr. Abrahamson and Mr. Sims. I do not believe that a valid distinction is that Mr. Abrahamson engaged in a white collar crime, merely intended to impede a federal investigation, and received federal funds only indirectly as a result of his wrongdoing and that of the others involved in the low-income housing scheme. Nor can I agree that, unlike Mr. Abrahamson's misdemeanor crime, Mr. Sims' misdemeanor offense rises to the level of moral turpitude on the facts. In short, I believe that the Board in Mr. Abrahamson's case correctly applied the factors identified in *Colson* and *Sims I* regarding the analysis of conduct involving moral turpitude on the facts, but did not do so in Mr. Sims' case and therefore deference was not owed to the Board's analysis, as I now proceed to explain.

In *In re McBride,* an attorney was convicted of a federal misdemeanor charge of aiding and abetting a client to commit passport fraud. *See In re McBride,* 578 A.2d 1102 (D.C.1990) (per curiam) (*McBride I*); *In re McBride,* 602 A.2d 626 (D.C.1992) (en banc)(*McBride II*); *In re McBride,* 642 A.2d 1270 (D.C. 1994)(*McBride III*). Initially the Board and a panel of this court determined that the attorney's conduct amounted to moral turpitude, *McBride I.* After the en banc court reversed *McBride I,* we adopted the report and recommendation of the Board finding no violation of moral turpitude on the facts. *See McBride II* and *III.* We suspended Mr. McBride for one year without a fitness requirement, instead of imposing disbarment as originally recommended by the Board prior to its analysis concerning moral turpitude on the facts. *McBride III, supra,* at 1271. We also adopted the Board's view that the attorney's "acts were not motivated for personal gain," that his "conduct harmed no one

and, although misguided, was intended to help a friend." As such, "[h]is conduct did not involve moral turpitude." *McBride III, supra*, at 1273. In setting forth the facts of Mr. McBride's case, the Board noted his age, the length of his membership in our Bar and his clean record except for his misdemeanor criminal plea, his service as a Department of Justice attorney, and his solo practice after retirement which focused on handling *pro bono* cases. The Board also developed a sympathetic picture of the client Mr. McBride sought to help, and labeled the act that led to his misdemeanor conviction as "aberrational." *Id.* at 1272–73. There are factual differences regarding Mr. McBride's misdemeanor conviction and that of Mr. Sims. But, it is instructive that ultimately the Board and this court considered the aberrational nature of Mr. McBride's conduct, his age, his *pro bono* work, and his prior clean record as an attorney in deciding to suspend Mr. McBride for one year without a fitness requirement. Moreover, in reaching its conclusion as to whether Mr. McBride's conduct involved moral turpitude on the facts because of "a desire for personal gain" the Board cited *In re Shorter*, 570 A.2d 760 (D.C.1990), a case in which an attorney was convicted of one felony count of willful tax evasion and six misdemeanor counts of willful failure to pay taxes, *id.* at 761, in stating that "although [Mr. McBride's] acts may be legally and ethically blameworthy, they cannot be said to be depraved or vile." *McBride III*, 642 A.2d at 1273.[2]

Before analyzing Mr. Sims' case further, I turn to *In re Tucker*, 766 A.2d 510 (D.C.2000) (per curiam) (*Tucker II*). Mr. Sims' case, in my view, is not the same as that of *Tucker II*, although these cases have a superficial similarity in that each involved parking tickets. The attorney in *Tucker II*, entered a plea of guilty to one count of misdemeanor bribery. The attorney admitted making six to eight payments to an employee of the BTA to "fix" parking tickets and to make sure that BTA records reflected payment of the tickets. He "signed a statement to a[n][FBI] agent describing the scheme and acknowledging that it had extended over several years." *Id.* at 511 n. 1. He was charged with a violation of D.C.Code § 11–2503(a), and a violation of D.C. Bar "Rule 3.5(a) (seeking to influence judge or other official); Rule 8.4(a) (violating or attempting to violate Rules), Rule 8.4(b) (committing a criminal act; engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(d) (engaging in conduct that seriously interferes with administration of justice)." *Id.* at 512. To prove its case against Mr. Tucker, Bar Counsel sought and received an order from this court "directing the Federal Bureau of Investigation (FBI) to produce materials relevant to a disciplinary proceeding and to make an FBI agent available to provide related testimony." *In re Tucker*, 689 A.2d 1214, 1214–15 (D.C.1997) (*Tucker I*). The order authorized the FBI agent to present testimony during Mr. Tucker's hearing before Hearing Committee Four, and to present "audio and video recordings relating to [Mr. Tucker's] alleged attempts to bribe an employee of the District of Columbia government." *Id.* at 1215. Based upon the evidence presented during the hearing, the Hearing Committee determined that "Bar Counsel clearly and convincingly showed that [Mr.] Tucker's conduct involved moral turpitude on the facts because the totality of facts surrounding his conduct involved sufficient intentional dis-

---

2. *Shorter* was decided prior to *McBride II* and *McBride III, supra*. We concluded in *Shorter* that "the specific acts underlying the charges [against Mr. Shorter] did not necessarily include conduct involving moral turpitude." *Id.* at 766.

honesty for the purpose of personal gain." The Board agreed with the Hearing Committee, and this court adopted the report and recommendation of the Board that Mr. Tucker should be disbarred "because there [was] substantial evidence in [the] case to support a finding of moral turpitude." *Tucker II*, 766 A.2d at 513.

Mr. Sims did not enter a guilty plea to misdemeanor bribery, as did Mr. Tucker; rather his plea was to one count of misdemeanor conflict of interest. Moreover, in sharp contrast to Mr. Sims' case, the evidence produced by Bar Counsel in *Tucker II* included testimony by an FBI agent before the Hearing Committee, and audio and videotapes made by the FBI. Bar Counsel presented no testimony during Mr. Sims' hearing before Hearing Committee Four, and relied on documentary evidence. That documentary evidence included the results of the investigation by two FBI agents, on which Bar Counsel relied. These results were presented in an unsigned FBI report rather than an affidavit. The report was based on interviews with at least six individuals. There is no indication in the record that the individuals gave sworn testimony under penalty of perjury. Two of the interview reports,

those of the Acting Chief of the BTA and a project manager responsible for TIMS, focused mainly on data processing issues. There was one interview with a BTA hearing examiner who did not know Mr. Sims well and who provided no information about his wrongdoing. Another hearing examiner knew Mr. Sims well and described him as "a fair hearing examiner"; Mr. Sims has provided legal representation for this examiner twice in civil matters. A former Acting Chief of the BTA portrayed Mr. Sims "as a lackluster student and trainee" who "dodged responsibility" and "was not astute in the application of the law." However, this person provided no information regarding the conduct underlying Mr. Sims' criminal conviction.

During Mr. Sims' plea hearing, the prosecutor summarized his wrongful actions but did not address his intent or motivation.[3] By saying, "Yes, Your Honor," Mr. Sims acknowledged that the prosecutor accurately described "what happened" but did not comment further. At Mr. Sims' sentencing hearing, the prosecutor also made a statement but again did not say anything regarding his intent or motivation.[4] Mr. Sims made a statement at his

3. The prosecutor stated in principal part:

On December 9, 1996, Ticket Number 202711902 was issued to the car leased by the Defendant for failure to display a front tag and a $50.00 fine was assessed. On the same day, the Defendant, acting in his official capacity as a hearing examiner, dismissed the ticket on the merits, thereby suspending the $50.00 fine. The evidence which demonstrates that the Defendant made that decision consists of a hearing record which he completed and signed and the fact that the decision was entered into BTA's computer system, using the Defendant's identification number and password which was known only to him.

The evidence would further have shown that between October 26th of 1995 and February 4 of 1997, the Defendant adjudi-

cated 19 other tickets which affected him or his family and resulted in a suspension of fines and late penalties totaling an additional $1,230.00.

4. The prosecutor asserted:

As set forth in the presentence report, the Defendant, while occupying the position of a hearing examiner, adjudicated 20 separate tickets that had been issued to himself and to members of his family. And he did that, despite the fact that there was an explicit prohibition of him handling matters concerning himself or his family. In addition, in a majority of those instances, he attempted to conceal the fact that he adjudicated the matters by entering into the computer the examiner code of another hearing examiner. These actions cost the D.C. Government $1,280.00.

sentencing but did not speak to the specific conduct underlying his offense.[5]

At the hearing before Hearing Committee Four, and in response to questions from his attorney, Mr. Sims testified about the policies of the BTA, his unsuccessful efforts to get some of his tickets resolved by his supervisor and the acting chief of the BTA, and his successful resolution when he submitted those tickets to a new BTA administrator. His attorney asked: "[W]hat was your perception of why tickets you had tendered were never dismissed?" He replied:

> Well, when I came into the agency, I was challenged on everything that I would do and there seemed to have been this direct bias towards me and that's, basically, why [I filed] my discrimination suit, because I thought I was receiving this disparate treatment and how they related to me, how my supervisors, basically, related to me because I was ... challenged ...—they would say if I was a minute late. I would [say] ..., "Well, wait a minute. We have different clocks. The clock you are using is not correct." And they would challenge that and say I'm a minute late. "You are getting charged AWOL," and so then that would lead to another writing of grievance and then onto the appeal process and ... this was just ongoing and ... it was just an inherent driven process that whatever I would do was challenged and so it was just a whole bias process, is my feeling.

He claimed that other "people would submit their tickets and they would get exonerated.... [but he] had different results" which he attributed to "a different policy" applied to him. The Chairman of the Hearing Committee asked Mr. Sims: "Why did you adjudicate tickets that had been issued to you and your wife and daughter instead of giving them to your supervisor?" He responded:

> Well, I didn't feel that when I sent the tickets through the process, that they were going to adjudicate them fairly and I felt that most of the tickets, based on what they were issued for, that the ones I did dismiss, I had ·good explanations

---

As part of our plea agreement, Your Honor, we agreed not to oppose the bottom of the guideline range in this matter. But given the position that the Defendant occupied and given the nature of the offense, we would request that there be some element of community service at least involved in the sentence. We also believe that a fine would be appropriate. We believe that the financial data set forth in the presentence report shows that the Defendant does have the ability to pay a fine. I would note that he has liquid assets, themselves totaling $1,700.00. And I would note that the majority of the debts appear to be debts that he has incurred with one or more of his children for college debts, which have been deferred, presumably until the child graduates.

For those reasons, we would ask the Court to impose a fine in this matter, at least the minimum fine, which would be in the amount of the $500.00.

5. After collecting himself, Mr. Sims said:

> I apologize to the Court for my emotion that I just displayed. I guess the last time I felt like that ... was probably at a funeral for my parents. But Your Honor, I want to thank the prosecution for allowing me to—for their consideration. I want to apologize to my employer and friends, as well as my wife, and to the Court, because I really feel very sad that I waited to have something like this happen to me at this late time in my life and that at my age, to have—be on this side of the Court, when before, I'm normally in a different situation. And ... I'm really sorry for this and I really put myself to the mercy of the Court.
>
> I believe that with what has happened to me now, I've learned a big, long lesson and I know that this blemish, I can try to recover a more exemplary life. And I would appreciate whatever consideration the Court will give me.

for them and they should have been adjudicated differently and if a person had appeared before me with that same explanation, I would have dismissed those tickets from those persons and that's why I did.

The Chairman also asked: "Why did you pay for some tickets and not pay for them all?" Mr. Sims answered: "[T]he tickets that were good tickets ... something that was [a] clear violation, I paid for it."[6]

On cross-examination, Mr. Sims admitted that when he was interviewed by the FBI, he "initially denied that [he] had done what [he] eventually pled guilty to." Using Bar Exhibit Number 11, which reflected the 20 tickets Mr. Sims dismissed, Bar Counsel established that the tickets were issued to Mr. Sims, his wife and his daughters. When Mr. Sims maintained that he "did dismiss some tickets but ... did it with [his] code," Bar Counsel posed the following question: "Well, do you acknowledge that the records that the FBI reviewed reflected that the codes of hearing examiners other than yourself were in their records?" Mr. Sims asserted: "I acknowledged that, I stood by that in my plea. I acknowledged it and I said yes. I accepted everything however they said it happened. I accepted that." The Chairman of the Hearing Committee asked followup questions to which Mr. Sims responded, as follows:

Q: I'm going to use the term "fixed" these tickets, meaning that you caused them to be dismissed. All these tickets, correct?

A: Yes, sir.

Q: Do you deny that you changed the ID code to reflect other examiners' names?

A: No, sir, I don't deny any of it.

Q: So the bottom line is that you admit that you tried to use the system by putting other examiners' names on there; is that correct?

A: That's correct.

Mr. Sims acknowledged wrongdoing during his testimony, but also provided an explanation of his conduct that did not center on a desire for personal gain, nor reflect actions prompted by his inability to pay the parking tickets. He detailed the RIF process that landed him at the BTA and his futile efforts to have parking tickets he deemed unfair adjudicated by BTA personnel. According to him, the futility of these efforts prompted his misguided actions, and exceedingly bad judgment, to seek justice by adjudicating some, but not all, of his own tickets and a few issued to other members of his family.

In *In re Spiridon*, 755 A.2d 463 (D.C. 2000), we described the kind of inquiry that must be made before a conclusion is reached as to whether conduct involves moral turpitude on the facts:

Once one accepts that conduct deemed criminal by a society ... may or may not involve moral turpitude, the determination becomes intensely specific to the particular facts and circumstances. Furthermore, the inquiry must be cognizant of the purpose: to determine whether the conviction of the offense in question

---

6. In response to the Chairman's question as to how he "[felt] about what [he] did," Mr. Sims stated:

I feel real bad. I mean I felt from the day of sentencing in the whole process, it is that I have never been on this side of the table, throughout my whole career, my whole life, I just felt that—-you get to a situation where you say you can turn the clock back and start over and this never would have occurred, I mean I would have done it differently .... I would have just bitten the bullet and went through the process and challenged it properly and just did what was required as I normally do, as I always should have done.

rises to such a level that the legislature would have intended as a consequence the automatic disbarment of the attorney in question.

*Id.* at 468. We have said that to rise to the level of moral turpitude, an attorney's conduct must reflect "baseness, vileness or depravity," *In re Tidwell,* 831 A.2d 953, 957 (D.C.2003), *In re Colson, supra,* 412 A.2d at 1168; that it must manifest "a revulsion of society toward conduct deeply offending the general moral sense of right and wrong," *McBride II, supra,* 602 A.2d at 632–33; *see also Sims I,* 844 A.2d at 365. "In addition, the actions of the attorney must be motivated by personal gain or manifest intentional dishonesty for the purpose of personal gain, rather than be simply 'misguided' actions." *Sims I, supra,* 844 A.2d at 365 (citing *Tucker II, supra,* 766 A.2d at 512; *McBride III, supra,* 642 A.2d at 1273).

To establish the existence of conduct involving moral turpitude on the facts, Bar Counsel has the burden of presenting clear and convincing evidence. *See* BPR Rule 11.5 ("Bar Counsel shall have the burden of proving violations of disciplinary rules by clear and convincing evidence."). In *Sims I,* we said:

Clear and convincing evidence relating to conduct underlying a criminal conviction may include an FBI or other law enforcement affidavit, [*In re Shillaire,* 549 A.2d 336, 343 (D.C.1988) ]; a statement given to the FBI or other law enforcement agency and signed by the attorney, *Tucker II, supra,* 766 A.2d at 513; audio or videotapes made by an FBI agent or other law enforcement official showing the attorney in an act of wrongdoing, *Tucker I, supra,* 689 A.2d at 1215; testimony by an FBI agent or other law enforcement official before the hearing committee, *id.;* and admissions

of the attorney who is subject to discipline, *id.* at 1217.

*Sims I* at 365.

Given these legal principles, our past decisions declaring what constitutes moral turpitude on the facts, and the burden of Bar Counsel to prove violations of the Rules of Professional Conduct by clear and convincing evidence as explained in *Sims I,* on the record in Mr. Sims' case, I cannot conclude that Bar Counsel sustained its burden with respect to the required showing for conduct involving moral turpitude on the facts. Mr. Sims entered a plea of guilty to one count of misdemeanor conflict of interest as follows:

On or about December 9, 1996, within the District of Columbia, the defendant NATHANIEL SIMS, being an employee of the Government of the District of Columbia, participated personally and substantially as a government employee, through decision in a request for ruling or other determination, in a matter in which he knew he had a financial interest; that is, the defendant NATHANIEL SIMS dismissed ticket number 202711902 which had been issued on December 9, 1996 by an employee of the Department of Public Works on the car leased by the defendant NATHANIEL SIMS thereby releasing the defendant NATHANIEL SIMS from his obligation to pay the $50 fine.

(In violation of Title 18, United States Code Sections 208 and 216(a)(1)).

In short, I find it impossible to say that Mr. Sims' "conviction of [this] offense … rises to such a level that the legislature would have intended as a consequence [his] automatic disbarment...." *Spiridon, supra,* 755 A.2d at 468. Nor can I agree that the conduct engaged in by Mr. Sims was "base[ ], vile[ ], depraved[ ]," nor was it of the type that would prompt "a revul-

sion of society toward conduct deeply offending the general moral sense of right and wrong," *Sims I, supra,* at 365 (quoting *Tidwell, supra,* 831 A.2d at 957; *McBride II, supra,* 602 A.2d at 632–33). And, although Mr. Sims had a financial interest in his conduct, as did Mr. Abrahamson, in my view Bar Counsel failed to establish by clear and convincing evidence that Mr. Sims lied about the reasons he articulated in explaining his actions. Those actions were clearly "misguided," *McBride III,* 642 A.2d at 1273, and reflected exceedingly poor judgment, but as the record in *Abrahamson, supra,* did not substantiate by clear and convincing evidence that he was motivated by personal gain, neither does the record in Mr. Sims' case substantiate by clear and convincing evidence that he was "motivated by personal gain or manifest[ed] intentional dishonesty for the purpose of personal gain," *Sims I, supra* at 365, in contrast to the record in *Tucker II,* 766 A.2d at 512.

Finally, "the responsibility for imposing sanctions rests with this court in the first instance." *Temple, supra,* 629 A.2d at 1207. And, while we generally defer to the Board, we do not accept its recommended sanction if it "would foster a tendency toward inconsistent dispositions for comparable conduct and would otherwise be unwarranted." D.C. Bar R. XI, § 9(g)(1). In my view, disbarring Mr. Sims would foster an inconsistent disposition for comparable conduct given our decisions in *Abrahamson* and *McBride,* and is unwarranted under the totality of the circumstances surrounding his case. I interpret this record as showing that Mr. Sims' conduct was just as aberrational as that of the attorney in *McBride III;* that just as the conduct of the attorney in *Abrahamson* did not rise to the level of moral turpitude on the facts, neither did that of Mr. Sims.

Both the Hearing Committee and the Board agree that "if disbarment [is] not mandated by [D.C.Code] § 11–2503(a), [Mr. Sims] should be suspended for one year with a requirement that he prove fitness to resume the practice of law." In light of our decisions in *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc), *In re Shillaire,* 597 A.2d 913 (D.C.1991), *McBride III,* and *Spiridon, supra,* a one-year suspension is an appropriate sanction. A one-year suspension was imposed on each of the attorneys in these cases. However, in *Hutchinson II* and *McBride III,* we suspended the attorneys for one year without a fitness requirement. *Shillaire II* involved reciprocal discipline and we added a fitness requirement because, in addition to the one-year suspension, Michigan required Mr. Shillaire to apply for readmission. *In re Shillaire,* 597 A.2d 913 (D.C.1991)(*Shillaire II* ). We imposed a fitness requirement in *Spiridon* because Mr. Spiridon had never practiced law and suffered from mental problems. In contrast to the attorneys in *Shillaire* and *Spiridon,* Mr. Sims is not receiving reciprocal discipline, has practiced law, and suffers from no mental or psychiatric problems. In addition, as in the case of Mr. McBride, I see "no reason to question [Mr. Sims'] ability to satisfy [the] five factors" relating to fitness that were announced in *In re Roundtree,* 503 A.2d 1215, 1217 (D.C. 1985). *McBride III,* 642 A.2d at 1275. We have discussed above the nature and circumstances of his misconduct. His statements of remorse before the United States District Court for the District of Columbia during his sentencing hearing, and during the hearing before Hearing Committee Four reflect a recognition of the seriousness of that misconduct. There is no indication in the record that he has engaged in any misconduct in his law practice or other aspects of his life. Prior to the entry of his guilty plea, he paid the

money he denied to the District government by his actions. And there is no reason on this record to question his present character, or his present qualifications and competence to practice law. Mr. Sims is a graduate of the Georgetown Law Center and holds a doctorate in educational administration from the University of Massachusetts at Amherst. For a substantial number of years he held positions in various departments and agencies of the District government, including the Department of Personnel, the Rental Accommodations office, and the Department of Public Works, with no disciplinary record. In addition, he participates in community, civic, and religious activities, including the Boy Scouts, the Hillcrest Children's Center, and his local church. He has been married for approximately thirty-six years, has five children, two of whom at the time of *Sims I* were still in elementary and secondary school; and he raised four foster children whose care he assumed following the death of their mother. In sum, on this record I am convinced that rather than protecting "the legal profession, the courts, and the public," *Lenoir, supra,* 604 A.2d at 15, or ensuring " the continued and restored fitness [of Mr. Sims] . . . to practice law," *Bettis, supra,* the sanction of disbarment imposed on Mr. Sims constitutes punishment despite the fact that "[o]ur purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney. . . ." *Steele, supra,* 630 A.2d at 200.

For the foregoing reasons, I respectfully dissent.